08-0074 Thomas O. Bennett James Bonham Corp. v. Randy Reynolds








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 08-0074
════════════
 
 
Thomas O. Bennett, Jr., and 
James B. Bonham Corporation, Petitioners,
 
v.
 
Randy Reynolds, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Third 
District of Texas
════════════════════════════════════════════════════
 
 
Argued December 
15, 2009
 
 
            
Justice Willett delivered 
the opinion of the Court, in which Chief 
Justice Jefferson, Justice Hecht, Justice Wainwright, Justice Medina, Justice 
Green, and Justice Guzman 
joined, and in all but Part II(A)(1) of which Justice Johnson joined.
 
            
Justice Johnson filed a 
concurring opinion.
 
            
Justice Lehrmann did not 
participate in the decision.
 
 
            
This case involves an extended drought, missing cattle, and feuding 
neighbors. In 2002 these factors sparked litigation over the auction of thirteen 
head of wandering cattle, culminating in a judgment for actual and exemplary 
damages. Today we clarify the standards for reviewing exemplary damages, which 
the United States Supreme Court has subjected to increasingly strict due-process 
scrutiny.
* 
* * * *
            
Texas is the top cattle-raising state in the nation,[1] home to 13.8 million head that contribute 
$15 billion to the state economy.[2] The Lone Star State thus looks unkindly 
on cattle theft, which unfortunately is not a colorful vestige of yesteryear.[3]
            
This case arose along the Colorado River in San Saba County, where cattle ranching is common and where cattle-raising 
neighbors Randy Reynolds and Thomas O. Bennett, Jr. nursed a longtime feud. In 
2002 Reynolds sued Bennett and a corporate landowner, the James B. Bonham 
Corporation, of which Bennett served as president, alleging they had sold 
thirteen head of Reynolds’s cattle that had strayed down a dry riverbed and onto 
Corporation land. Bennett was acquitted of felony theft, but a civil jury found a conversion and assessed $5,327.11 in 
actual damages (the cattle’s market value) plus combined exemplary damages of 
$1.25 million: $250,000 against Bennett and $1 million against the Corporation. 
Both insist there is no basis for exemplary damages, and that the 
exemplary-to-compensatory ratios here — 47:1 as to Bennett and 188:1 as to the 
Corporation (235:1 combined) — offend the “substantive” limitations of the Due 
Process Clause of the Fourteenth Amendment.[4] In addition, the Corporation argues that 
Bennett’s acts cannot be imputed to the Corporation.
            
We agree with the court of appeals that exemplary damages are justified 
against both Bennett and Bonham Corporation. That said, 
we are constrained by governing Supreme Court ratio analysis, which in recent 
years has repeatedly struck down outsized awards on due-process grounds.[5] The jury’s $1.25 million award in this 
case was similarly excessive, so we remand to the court of appeals for remittitur consistent with controlling ratio analysis.
I. Background
            
The Colorado River separates the northern edge of San Saba County from 
Mills County. When the river is flowing, it forms a natural property barrier, 
and some landowners abutting the Colorado rely on the river to confine their 
cattle. However, when the river runs dry, as it did in the summer and fall of 
2000, cattle in unfenced areas often wander along and across the dried riverbed 
and wind up in neighboring pastures.[6] The stray cattle are usually located and 
returned, but occasionally they escape for good.
            
The Bonham Corporation owns the 914-acre Bennett Ranch along the 
Colorado. Sisters Brenda Bennett and Julie Munden 
purportedly own the Corporation,[7] and their father, Thomas Bennett 
(Bennett), is the unsalaried and non-shareholder president who lives on the 
ranch in a Corporation-owned home. The Corporation owns no cattle, but Bennett 
does, and he runs them on the Corporation’s property. Upriver and on the same 
side, Randy Reynolds runs cattle on a 320-acre pasture leased from his 
mother-in-law.
            
 The Bennett-Reynolds dispute dates back to a 1996 quarrel over 
construction costs for a new barbed-wire fence dividing their properties. 
Reynolds discovered Bennett and a Corporation work crew bulldozing a section of 
old fence, and Bennett suggested they split rebuilding costs. Reynolds declined, 
and Bennett eventually filed a small-claims suit against Reynolds in December 
2000. Reynolds prevailed at trial and, while still in the courtroom, mentioned 
to Bennett he was missing some cattle and asked if Bennett had seen them. 
Bennett immediately went upstairs to the sheriff’s office and accused Reynolds 
of stealing his cattle. Reynolds in turn reported his own cattle missing. 
That same day, the sheriff accompanied Bennett to the Reynolds property, and a 
deputy joined Reynolds at the Bennett place. No missing cattle were found.[8]
            
Reynolds says Bennett knowingly led the officers on a wild goose chase — 
“searching for cattle he knew were long gone” — because Bennett three months 
earlier had already rounded up and auctioned Reynolds’s strays. In October 2000 
Reynolds noticed that 23 head of cattle were missing.[9] Reynolds spotted six of them next door at 
the Bennett Ranch and retrieved them. Unable to find the others, he reported 
them missing to the Texas and Southwestern Cattle Raisers Association 
(TSCRA).[10] Also around that time, Bennett ordered 
two Bonham Corporation ranch hands to help him round up and load cattle Bennett 
had identified for auction; they trailered and sold 
thirteen head, which netted $5,327.11. At the time, both ranch hands raised 
concerns with Bennett that the cattle were not his.
            
Roughly a year later, one of the ranch hands, Larry Grant, told Reynolds 
he suspected Bennett had auctioned some of Reynolds’s cattle. While driving to 
the auction, Grant purchased a disposable camera and took photographs of the 
cattle, some of which bore a brand registered to Reynolds. Grant gave the 
photographs to TSCRA after he quit his job with the Corporation, shortly after 
the auction.
            
In early 2002 Bennett was indicted for cattle theft. Upon Bennett’s 
indictment, Reynolds sued him and Bonham Corporation for conversion and sought 
exemplary damages in excess of the statutory caps, alleging their misconduct was 
malicious and constituted third-degree felony theft under Chapter 31 of the 
Penal Code.[11]
            
Bennett was acquitted of the criminal charges in 2003, but the civil case 
proceeded, and Bennett counterclaimed, alleging Reynolds had conspired with 
Larry Grant to falsely accuse Bennett of cattle theft. While neither side 
disputed that Bennett had directed two ranch hands to sell thirteen head of 
cattle and that the sale netted $5,327.11, the parties disputed everything else. 
They disputed whether Bennett or Reynolds owned the cattle, Bennett’s state of 
mind regarding who owned the cattle, and the culpability of Bonham Corporation 
for any wrongdoing by Bennett.
            
The jury sided with Reynolds, finding (1) Bennett and the Corporation 
both converted Reynolds’s cattle, (2) they did so with malice, and (3) they 
committed felony theft. The jury assessed $5,327.11 in compensatory damages 
(imposed jointly and severally by the trial-court judgment) plus exemplary 
damages of $250,000 against Bennett and $1 million against the Corporation. The 
court of appeals affirmed.[12]
II. Discussion
            
Bennett and the Corporation attack the $1.25 million in exemplary damages 
on two grounds:
 
                        
1.         
The award “is unwarranted under Texas law and exceeds constitutional 
bounds”; and
 
                        
2.         
“Liability for punitive damages cannot be imputed to the 
Corporation.”
 
 
A. Whether the 
Exemplary Damages are Statutorily Unwarranted
and Constitutionally Excessive
 
            
Bennett and Bonham Corporation lodge both statutory and constitutional 
objections. First, they assert the court of appeals “grossly contorted” and 
“dangerously expanded” the statutory predicate for exemplary damages (malice) in 
a way that invites such damages in all cases of intentional misconduct. 
Alternatively, they argue the award flouts the Supreme Court’s due-process 
framework in several respects.
1. The Statutory 
Predicate of Malice
 
            
Bennett contends the evidence was legally insufficient to support a 
finding of malice. Chapter 41 of the Civil Practice and Remedies Code permits 
exemplary damages where the plaintiff proves by clear and convincing evidence 
that harm resulted from “malice.” In the version of Chapter 41 applicable here, 
malice covers intentional torts and gross negligence.[13] As to 
intentional torts, malice denotes “a specific intent by the defendant to cause 
substantial injury to the claimant.”[14]
            
Bennett argues no evidence of malice exists because he “merely sold some 
cattle that were not his.” He says intentionally selling another’s stray 
livestock as one’s own and pocketing the proceeds falls short of malice. Here, 
the jury charge properly defined malice to include “a specific intent by 
Defendant Bennett to cause substantial injury to Plaintiff.” The jury heard 
testimony that Bennett ordered the sale of Reynolds’s cattle despite being 
warned when they were penned and loaded that they belonged to someone else. The 
jury could have reasonably formed a firm belief or conviction,[1][5] from the theft itself and from the 
ongoing hostilities between the parties, that there was nothing accidental about 
Bennett’s conduct and that he specifically intended to injure Reynolds by taking 
his property. Bennett concedes in this Court that “there is legally sufficient 
evidence that the cattle were Reynolds’s and Bennett knew it.” This record, 
viewed in the light most favorable to the jury’s finding of malice, amply 
demonstrates Bennett’s awareness and intent to convert Reynolds’s cattle and 
then cover his tracks; such evidence implies willfulness, not inadvertence or an 
honest mistake.
            
This is a money-damages case, and certainly cases involving death, 
physical injury, or financial ruin might warrant “greater punishment”[16] than cases lacking such harms. However, 
exemplary damages are not reserved solely for cases that inflict ruinous 
physical or fiscal calamity.
            
Further, there was legally sufficient evidence that Bennett intended to 
cause “substantial” injury to Reynolds. Under the Penal Code, the theft of 
thirteen head of cattle constitutes a third-degree felony,[17] punishable by a fine of up to $10,000 
and up to a decade behind bars.[18] While the criminal jury acquitted 
Bennett, the civil jury found his actions constituted cattle theft, thus 
triggering the felony exception to the exemplary-damages cap.[19] Texas law, both civil and criminal, thus 
reflects the Legislature’s policy judgment that stealing cattle inflicts 
substantial harm and merits harsh punishment. Moreover, the loss of livestock 
with a market value exceeding $5,000 was not trivial or de minimis to Reynolds. Bennett concedes in his opening brief 
that the market value of the stolen cattle “is not nominal,” and in his reply brief that “it is certainly clear 
that the compensatory damages award of $5,327.11 here is not small.” We 
have recognized that the term “‘substantial’ has two basic components: real vs. 
merely perceived, and significant vs. trivial.”[20] The injury here 
was both real and significant.
2. Constitutional Due-Process Limits
            
Bennett and Bonham next argue the award is unconstitutionally excessive 
because it violates due-process constraints. For many years, the United States 
Supreme Court has reined in awards it deems excessive. In 1989, the Court 
rejected the argument that the Excessive Fines Clause of the Eighth Amendment 
limits exemplary damages,[21] but reserved for “another day” whether 
“the Due Process Clause places outer limits on the size of a civil damages 
award.”[22] That day arrived two years later when 
the Court identified such limits and held that boundless discretion “may invite 
extreme results that jar one’s constitutional sensibilities.”[23] Conceding it could not formulate “a 
mathematical bright line between the constitutionally acceptable and the 
constitutionally unacceptable,”[24] the Court upheld a 4:1 ratio of 
exemplary-to-actual damages, but admonished that 4:1 “may be close to the line . 
. . . of constitutional impropriety.”[25]
            
In the intervening two decades, the Court has steadily restricted 
exemplary damages and tightened the due-process standards by which courts assess 
them. The prevailing principle is that a “grossly excessive” award offends due 
process because it “furthers no legitimate purpose and constitutes an arbitrary 
deprivation of property.”[26]
            
The first case to invalidate an award of exemplary damages on due-process 
grounds was the landmark 1996 decision BMW of North America, Inc. v. 
Gore,[27] a case involving BMW’s concealment of 
pre-delivery damage to new vehicles. Gore introduced a three-part 
framework to “illuminate the character of the standard that will identify 
unconstitutionally excessive awards.”[28] The Court refined the Gore 
guideposts in State Farm Mutual Automobile Insurance Co. v. Campbell:
 
                        
1.         
“the degree of reprehensibility of the 
defendant’s conduct”;
 
                        
2.         
“the disparity between the actual or potential 
harm suffered by the plaintiff and the punitive damages award”; and
 
                        
3.         
“the difference between the punitive damages 
awarded by the jury and the civil penalties authorized or imposed in comparable 
cases.”[29]
 
 
a. Reprehensibility
            
Gore described this first guidepost, focused on the “enormity” of 
the misconduct, as “the most important indicium of the 
reasonableness of a punitive damages award.”[30] Elaborating, the Court has urged 
consideration of five nonexclusive factors — whether:
                        
1.         
the harm inflicted was physical rather than 
economic;
 
                        
2.         
the tortious conduct 
showed “an indifference to or a reckless disregard for the health or safety of 
others”;
 
                        
3.         
“the target of the conduct had financial 
vulnerability”;
 
                        
4.         
“the conduct involved repeated actions,” not 
just “an isolated incident”; and
 
                        
5.         
the harm resulted from “intentional malice, 
trickery, or deceit,” as opposed to “mere accident.”[31]
            
One factor alone “may not be sufficient to sustain a punitive damages 
award, and the absence of all of them renders any award 
suspect.”[32] And though we 
must presume that “a plaintiff has been made whole for his injuries by 
compensatory damages,”[33] exemplary damages are permitted if the 
wrongdoing “is so reprehensible as to warrant the imposition of further 
sanctions to achieve punishment or deterrence.”[34]
            
This case poses a critical threshold matter: whether Bennett’s actions 
beyond the conversion itself may factor into the reprehensibility analysis. 
Reynolds paints a picture of unalloyed Bennett corruption, alleging a “scheme of 
deception” aimed at tainting both the civil and criminal trials: “attempting to 
bring false charges against Reynolds, threatening physical harm to a witness, 
attempting to bribe witnesses, and encouraging witnesses to lie about the round 
up and sale of Reynolds’s cattle.” The theft “should not be examined in a 
vacuum,” says Reynolds, nor should the Court divorce 
the underlying tort from the overall “criminal escapade,” conduct that Reynolds 
likens to outright legal thuggery.
            
Bennett disputes any exemplary-damages liability, saying his 
misdeed “inflicted solely economic harm, for which compensatory damages were 
awarded” and that no other reprehensibility factor is present. His conversion 
may have been intentional rather than inadvertent, Bennett says, but it was not 
malicious. As for the alleged efforts to conceal his wrongdoing, Bennett says dissimilar misconduct separate and 
apart from the conversion itself has no role in the punitives analysis; only the isolated act of selling the 
cattle matters. He argues that so-called concealment evidence, to support 
exemplary damages, must go to the harm inflicted by the underlying malfeasance. 
Bennett asserts a disconnect here, contending the award was premised on conduct 
external to what the jury was empaneled to decide and 
involving people not before the jury.
            
The Supreme Court has offered limited guidance as to the range of the 
defendant’s conduct that should be considered in evaluating reprehensibility. In 
State Farm, the Court held that exemplary damages cannot be wielded “to 
punish and deter conduct that bore no relation to the [plaintiff’s] 
harm.”[35] That is, reprehensibility analysis “does 
not permit courts to expand the scope of the case so that a defendant may be 
punished for any malfeasance.”[36] On the other 
hand, the Court made clear that related conduct “may be probative when it 
demonstrates the deliberateness and culpability of the defendant’s action,” 
provided that the conduct bears “a nexus to the specific harm suffered by the 
plaintiff.”[37] Obviously, a 
tortfeasor’s attempts to cover his tracks and escape 
responsibility can imply willfulness. In addition, the Supreme Court in Gore 
suggested it may be proper to consider wrongdoing of the type Reynolds 
alleges, noting “the record . . . discloses no deliberate false statements, acts 
of affirmative misconduct, or concealment of evidence of improper motive . . . 
.”[38]
            
We align generally with Reynolds that Bennett’s alleged extra-conversion 
misdeeds (at least most of them) count properly toward reprehensibility, as they 
relate back to the underlying theft and sought to extend and exacerbate harm to 
Reynolds. We recognize as a general matter that exemplary damages are not meant 
to redress wrongdoing that occurs in litigation, but to redress 
wrongdoing that results in litigation. They should center on the unsavoriness of the acts, not the actor. That said, while 
Bennett’s alleged “scheme of deception” is not why he was sued, much of it is 
interlaced with the theft itself and thus aimed to worsen the damage inflicted 
on Reynolds.
            
The Court’s openness to surrounding conduct is consistent with the 
approach taken in the Second Restatement of Torts:
In 
determining the amount of punitive damages, as well as in deciding whether they 
should be given at all, the trier of fact can properly 
consider not merely the act itself but all the circumstances including the 
motives of the wrongdoer, the relations between the parties and the provocation 
or want of provocation for the act.[39]
 
            
A reprehensibility analysis can therefore consider, to some extent, 
surrounding circumstances beyond the underlying tort. Some of Bennett’s furtive 
actions may go to motive, underscore the parties’ animosity, shed light on 
provocation, demonstrate deliberateness and culpability, and otherwise show 
heightened reprehensibility. In short, most of Bennett’s non-theft wrongdoing, 
while perhaps separately redressable via court-ordered 
sanctions or other legal proceedings, is sufficiently entwined with the theft to 
enter the exemplary-damages calculus. However, this other malfeasance, however 
related, does not transform this conversion claim into one that warrants a 
double- or triple-digit ratio.
            
Against that backdrop, we determine that the following allegations may 
properly inform the reprehensibility analysis:
            
Bribing A Witness and Urging Him to Lie. Reynolds offered evidence 
that when Bennett learned that former ranch hand Larry Grant had taken 
incriminating photographs of the stolen cattle, Bennett urged Grant to lie about 
what he had seen. Bennett then offered Grant a lucrative job and later some 
money under the guise of helping Grant’s family after a car accident.
            
Threatening a Witness. Reynolds points to 
testimony that a former Corporation ranch hand attempted to threaten bodily harm 
to Grant. Allegedly, this former employee tried to call and threaten Grant, but 
instead reached Grant’s brother-in-law, thinking that person was Grant.
            
The Supreme Court in State Farm disapproved of letting juries 
punish alleged torts against third parties.[40] Though the Court stressed that exemplary 
damages cannot be used to punish extraneous acts or harm against nonparties, 
that principle seems inapposite when a physical threat (here a blundered threat 
that apparently never reached its intended target) aims to hide the 
complained-of malfeasance and evade responsibility. Moreover, the Court stated 
in Philip Morris USA v. Williams that harm to nonparties may enter the 
reprehensibility analysis,[41] but a jury cannot use exemplary 
damages to punish a defendant for harming nonparties.[42] However indistinct this distinction 
might be,[43] it seems sensible that harm inflicted or 
threatened on third parties can be part of the reprehensibility equation when 
such harm actually targets the plaintiff and the instant litigation. Here, 
though, the alleged threat went off course, and the record does not show it was 
ever communicated to Grant; in reality no one was actually endangered. 
Nonetheless, while this misdirected threat threatened nobody, it attempted to 
cover Bennett’s tracks and foil efforts — not just by Reynolds but by the legal 
system itself — to unearth the truth.
            
Photograph Tampering. The evidence at 
both the civil and criminal trials included some of the photographs taken by 
ranch hand Grant, who suspected that the trailered 
cattle were not Bennett’s. Reynolds alleges that Bennett doctored some of 
Grant’s photographs to bolster his criminal defense and offered perjured 
testimony in that trial. Moreover, Reynolds asserted in the civil suit that the 
photographs had been altered to conceal evidence of Bennett’s conversion.
            
Litigation Against Grant. Bennett filed a 
$50,000 slander suit against ranch hand Grant. Reynolds says these “intimidation 
techniques” showed “that Bennett intended to inflict as much financial pain on 
Grant as possible.” Here, too, the jury could reasonably have deemed this 
slander suit, though filed against Grant, part of a pattern of intentional 
malice, trickery, and deceit to cover up Bennett’s wrongdoing and subvert 
Reynolds’s lawsuit.
            
Meddling With Reynolds’s Brand. The 
County and District Clerk of San Saba County testified that Bennett once 
attempted to register Reynolds’s brand as his own. This cover-up evidence shows 
“deliberateness and culpability” and can enhance exemplary damages given its 
“nexus to the specific harm suffered by the plaintiff.”[44] We have 
previously held that certain cover-up efforts can show reprehensibility, as when 
a manufacturer of asbestos-containing products continues selling what it knows 
is dangerous.[45]
            
At heart, though, this is an economic-injury, actual-harm case seeking 
recovery for the conversion of thirteen head of cattle. Reynolds alleges a 
broader “criminal escapade” that aimed to ruin him, but the theoretical 
possibilities of greater harm strike us as marginally relevant at best in 
assessing exemplary damages, absent proof of the likelihood of such harms. 
Bennett’s tort was not part of a wider plan to steal Reynolds’s entire herd or 
to bankrupt him. Nor is there evidence that Bennett was a recidivist cattle 
thief rather than a first-time offender.[46] This lawsuit 
has a narrower focus, and the jury’s findings focus on conversion.
            
Summing up, Reynolds’s evidence of a malicious cattle theft and various 
furtive acts to conceal it satisfies one of the five State Farm 
reprehensibility factors: the harm resulted from intentional malice, trickery, 
or deceit. As discussed below, the other factors are essentially absent, and 
there is no other justification for $1.25 million in exemplary damages. 
Accordingly, the Supreme Court’s ratio analysis must be assiduously 
followed.
b. Ratio Between Exemplary and 
Compensatory Damages
            
In State Farm, the Court “decline[d] again to impose a bright-line 
ratio” of exemplary to actual damages, but stated that “in practice, few awards 
exceeding a single-digit ratio . . . will satisfy due process” and that “an 
award of more than four times the amount of compensatory damages might be close 
to the line of constitutional impropriety.”[47]
            
Drawing on State Farm and other authority, we held, in Tony 
Gullo Motors I, L.P. v. Chapa,[48] that a ratio of 4.33 to 1 exceeded 
constitutional limits where only the fifth of the five reprehensibility factors 
favored exemplary damages. In that case, the plaintiff claimed that an 
automobile dealer had committed fraud by promising to deliver a certain model 
and delivering instead a less-luxurious model. The dealer’s bait-and-switch 
included various deceptions, including forged signatures of the plaintiff and 
her deceased husband. The jury awarded economic damages of $7,213, the 
difference in the values of the two models, and mental-anguish damages of 
$21,639 (three times economic damages). Considering the first four 
reprehensibility factors, we concluded that the defendant’s conduct did not 
cause physical harm, did not threaten the health or safety of others, did not 
involve repeated actions, and did not threaten financial ruin.[49] Only the fifth factor favored exemplary 
damages because the conduct was deceitful rather than accidental.[50] We then stressed State Farm’s 
admonition that any ratio above 4:1 “might be close to the line of 
constitutional impropriety.”[51] Noting that a 4.33 multiplier “at least 
pushes against, if not exceeds, the constitutional limits,”[52] we ultimately held:
 
Pushing 
exemplary damages to the absolute constitutional limit in a case like this 
leaves no room for greater punishment in cases involving death, grievous 
physical injury, financial ruin, or actions that endanger a large segment of the 
public. On this record, Gullo Motors’ conduct merited 
exemplary damages, but the amount assessed by the court of appeals exceeds 
constitutional limits.[53]
 
In short, 4.33 
times actual damages was constitutionally 
excessive.
            
The facts of today’s case are not meaningfully distinguishable from those 
in Gullo Motors. Under the first four 
reprehensibility factors, as interpreted in Gullo Motors, Bennett’s conduct did not cause 
physical harm, did not endanger the health or safety of others,[54] did not involve repeated 
actions,[55] and did not threaten financial ruin. 
Only the fifth factor favors exemplary damages, in that Bennett’s conduct was 
the result of intentional malice rather than mere accident. We are bound by 
Gullo Motors and accordingly hold that 
both ratios in this case were excessive.
            
However, we pause to note that rigid application of a 4:1 ratio is not 
universally required. State Farm recognized that “ratios greater than 
those we have previously upheld may comport with due process where ‘a 
particularly egregious act has resulted in only a small amount of economic 
damages.’”[56] Reynolds insists this case fits that 
upward-departure exception. The court of appeals agreed, acknowledging “these 
ratios appear superficially dramatic,”[57] but concluding this was a case where 
especially abhorrent conduct inflicted only modest economic harm.[58] We disagree.
            
As discussed above with respect to the statutory malice requirement, the 
economic damages of $5,327.11 were substantial and cannot fairly be 
characterized as nominal or trivial. Reynolds cannot successfully argue that 
actual damages were substantial for state statutory purposes (thus allowing 
exemplary damages) but were insubstantial for federal constitutional purposes 
(thus allowing large exemplary damages). Though dwarfed by the punitive 
damages, $5,327.11 is not trivial; it is the amount the jury believed would 
redress the concrete loss that Reynolds suffered.
            
Even assuming that $5,327.11 is “small,” the other part of the exception 
— “a particularly egregious act”[59] — is absent here just as in Gore, 
where the Court rejected $2 million in exemplary damages on $4,000 in actual 
damages. We cannot characterize the conversion here as qualitatively or 
quantitatively more egregious that the fraud in Gullo Motors. By one objective measure, 
Bennett’s misconduct was less egregious: Reynolds sought no damages for 
mental anguish, unlike the plaintiff in Gullo Motors, whose mental-anguish damages 
were three times her economic damages. The only actual harm Reynolds pled and 
proved were economic damages.
            
If courts fail to diligently police the “particularly egregious” 
exception, they insulate from due-process review precisely those cases where 
judicial review matters most: those involving unsympathetic defendants where 
juries are most likely to grant arbitrary and excessive awards.[60] Allowing a 
freewheeling reprehensibility exception would subvert the constraining power of 
the ratio guidepost.
            
The Fifth Circuit has twice upheld triple-digit ratios post-State 
Farm: (1) 110:1 in a housing-discrimination case where compensatory damages 
were only $500;[6][1] and (2) 150:1 in a civil-rights case 
where nominal damages were only $100.[62] Both cases are distinguishable. The 
former turned on two key facts not present here: (1) there were “inherently low 
or hard-to-determine actual injuries”[63] (Gore’s other 
upward-departure exception),[6][4] and, (2) there was a $55,000 statutory 
maximum civil penalty for a comparable first-time offense, which the court held 
“offers the appropriate award on this record.”[65] The latter case is also inapposite given 
its civil-rights nature: “Because actions seeking vindication of constitutional 
rights are more likely to result only in nominal damages, strict proportionality 
would defeat the ability to award punitive damages at all.”[66]
            
In sum, Bennett’s wrongdoing is blameworthy enough to warrant exemplary 
damages, but under federal law “a more modest punishment for this reprehensible 
conduct could have satisfied the State’s legitimate objectives.”[67] We commend the court of appeals’ careful 
and extensive analysis, but we disagree that this case falls within the 
Gore/State Farm exception that leaves room for a higher 
multiplier.[68] Following our analysis in Gullo Motors, the exemplary damages here were 
unconstitutionally excessive. As “the amount of a suggested remittitur is in the first instance a matter for the courts 
of appeals,”[69] we remand to that court.
c. Legislative Penalties for Similar Misconduct
            
The final guidepost compares the exemplary damages with legislatively 
authorized civil sanctions.[70] In this case we need not discuss the 
“comparable sanctions” guidepost at all, as unconstitutional excessiveness is 
aptly demonstrated under the ratio guidepost above.[71] But we add this brief word.
            
This factor fortifies the notion that legislatures make policy and are 
well positioned to define and deter undesired behavior. Accordingly, reviewing 
courts “should accord substantial deference to legislative judgments concerning 
appropriate sanctions for the conduct at issue.”[72] In cases where applicable civil 
penalties exist, this guidepost gives bad actors fair notice of what is 
forbidden and of potential penalties. Today’s case, however, is not ordinary, 
given the absence of civil penalties and the presence of criminal ones. The two 
are incommensurate, and incarceration does not translate meaningfully to a 
dollar-figure fine.[73]
            
The court of appeals looked to both civil and criminal statutes. On the 
criminal side, it noted the Penal Code provisions on third-degree felony theft 
(punishable by two to ten years imprisonment)[74] and witness tampering (punishable by six 
months to two years).[75] The Supreme Court in Haslip and Gore “also looked to criminal 
penalties that could be imposed,”[76] since “[t]he existence of a criminal 
penalty does have bearing on the seriousness with which a State views the 
wrongful action.”[77] But in State Farm the Court added 
this caution: “When used to determine the dollar amount of the award, however, 
the criminal penalty has less utility.”[78] The Court explained that “[p]unitive damages are not a substitute for the criminal 
process, and the remote possibility of a criminal sanction does not 
automatically sustain a punitive damages award.”[79] State Farm reflects the Court’s 
evolving view of exemplary damages and stresses the limited usefulness of 
criminal penalties, but notably State Farm and Gore mention that 
legislative sanctions often take the form of double, treble, or quadruple 
damages.[80]
            
Here, the criminal jury acquitted Bennett of cattle theft, but the civil 
jury found that he and the Corporation did “commit theft of 10 or more head of 
cattle during a single transaction and . . . the aggregate value of those cattle 
[was] less than $100,000.00.” This finding tracks (1) the then-applicable Penal 
Code definition of third-degree felony theft,[8][1] which aside from a possible decade-long 
incarceration permits a fine “not to exceed $10,000,”[82] and (2) the felony theft exception to 
the statutory cap on exemplary damages.[83]
            
On the civil side, the court of appeals emphasized
 
the Texas Legislature’s policy choice to exempt conduct 
constituting third-degree felony theft from the caps otherwise applicable to 
punitive damages awards. . . . [B]arring contrary 
constitutional impediments, the legislature has deemed such conduct so serious 
as to remove the state statutory limitations otherwise restricting the amount of 
punitive damage awards for such conduct.[84]
 
            
In ordinary civil cases, Section 41.008 of the Civil Practice and 
Remedies Code caps exemplary damages at an amount not to exceed the greater of 
(1) $200,000 or (2) noneconomic damages (up to $750,000) plus two times economic 
damages.[85] However, the Legislature makes this 
statutory ceiling inapplicable to conduct constituting third-degree (and higher) 
felony theft, like stealing cattle.
            
The Legislature inarguably has discretion to deem certain crimes more 
detestable than others and thus deserving of harsher punishment.[86] But that does 
not prevent due process from mandating a lower award. As we emphasized in Gullo Motors, the Supreme Court requires us to 
look to civil penalties “‘imposed in comparable cases.’”[87] We cannot 
conclude that the general $200,000 ceiling reflects the Legislature’s judgment 
that this amount, much less a higher uncapped amount, is thus constitutionally 
permissible. Lifting the $200,000 cap in some cases does not demonstrate 
constitutional propriety in this case. Indeed, even an award well below 
the statutory ceiling can offend due process.[88]
            
In sum, the “comparable sanctions” guidepost offers little guidance — 
there are no on-point civil penalties — though pegging punitives to the $10,000 criminal fine would produce a 1.877 
ratio.
d. The Exemplary-Damages Award Violated Due Process
            
Our settled practice is not to remit unconstitutional awards ourselves or 
to prescribe a required ratio, though on this record, even 4:1 seems a stretch: 
“Pushing exemplary damages to the absolute constitutional limit in a case like 
this leaves no room for greater punishment in cases involving death, grievous 
physical injury, financial ruin, or actions that endanger a large segment of the 
public.”[89] The award in 
this case cannot be squared with our on-point Gullo Motors decision, another “scheme of 
deception” case.
            
The Supreme Court is decidedly hands-on when scrutinizing high-dollar 
exemplary-damages awards, and we are confident the 
Court would conclude this award “was neither reasonable nor proportionate to the 
wrong committed, and it was an irrational and arbitrary deprivation of the 
property of the defendant.”[90]
B. Corporate Liability for Exemplary Damages
            
Bonham Corporation contends it cannot be assessed exemplary damages for 
Bennett’s conduct. We disagree.
            
Section 41.005(c) of the Civil Practice and Remedies Code addresses the 
imposition of exemplary damages against a defendant for the criminal act of 
another. The jury charge tracked this statutory provision, which states:
In an 
action arising out of a criminal act committed by an employee, the employer may 
be liable for punitive damages but only if:
 
(1) the principal authorized the doing and the manner of the 
act;
 
(2) the agent was unfit and the principal acted with malice in 
employing or retaining him;
 
(3) the agent was employed in a managerial capacity and was 
acting in the scope of employment; or
 
(4) the employer or a manager of the 
employer ratified or approved the act.
            
The jury imposed exemplary damages against the Corporation but was not 
asked to specify which subpart of the statute it found applicable. The evidence 
was legally sufficient to uphold exemplary damages under subpart (1), which 
imposes liability if “the principal authorized the doing and the manner of the 
act.”
            
Corporations, of course, “can act only through human agents.”[91] Corporate decisions, likewise, are 
ultimately made by human agents. In deciding whether exemplary damages can be 
assessed against a corporation, we have focused on the concept of a 
vice-principal. In Hammerly Oaks, Inc. v. 
Edwards, we explained that acts of a vice-principal are deemed to be acts of 
the corporation for purposes of exemplary damages because the vice-principal 
“represents the corporation in its corporate capacity.”[92] As we explained 
in GTE Southwest, Inc. v. Bruce:
 
When 
actions are taken by a vice-principal of a corporation, those acts may be deemed 
to be the acts of the corporation itself. A vice-principal represents the 
corporation in its corporate capacity, and includes persons who have authority 
to employ, direct, and discharge servants of the master, and those to whom a 
master has confided the management of the whole or a department or division of 
his business.[93]
 
            
In Chrysler Insurance Co. v. Greenspoint 
Dodge of Houston, Inc., we further explained that a vice-principal includes 
four classes of human agents:
 
(a) 
Corporate officers; (b) those who have authority to employ, direct, and 
discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those 
to whom a master has confided the management of the whole or a department or 
division of his business.[94]
 
 
            
Under these formulations, not only was Bennett indisputably a 
vice-principal of Bonham Corporation, he was most likely the only vice-principal 
and the only person whose conduct and decisions could subject the corporation to 
exemplary damages.
            
Bennett was the highest corporate officer, the president. Further, he was 
not a corporate officer in name only. Regarding the Ranch operations, Bennett 
testified: “I make the decisions,” and “I run the ranch.” There was no evidence 
that he had ever received a single order from his daughters, the putative 
owners, regarding how to conduct Corporation business.
            
In addition to Bennett’s de facto control over Ranch operations, he was 
formally vested with control over the Corporation. The corporate charter and 
bylaws gave him broad authority to act as the Corporation, including “such 
powers and duties as are commonly incident to his office” as “the chief 
executive officer of the corporation.” According to a resolution from a 1991 
shareholder meeting, Bennett was:
 
            
authorized to transact business on behalf of the 
corporation. He shall be fully authorized to sign deeds, notes, deed of trust, 
mineral deeds, royalty contracts, oil and gas leases, and all other legal papers 
and documents in the name of and on behalf of the corporation. Also, he shall be 
entitled to run his personal livestock on any corporate land.
 
            
Not only did Bennett direct ranch operations generally, but he used his 
authority to direct corporate employees, on corporation time, to load Reynolds’s 
cattle and sell them at auction, the specific tortious 
conduct that led to the assessment of exemplary damages. The cattle were on 
Corporation-owned land, and Bennett used Corporation-owned trucks to accomplish 
the conversion. The corporate charter states that its purposes include 
“development” of the Ranch property. Insofar as Bennett exercised control over 
the use or development of the property by removing Reynolds’s cattle, he was 
acting in a corporate capacity. Further, Bennett testified that he received no 
salary from the Corporation to serve as its president, but did receive a lease 
to run his cattle as payment for his service. Bennett may have personally 
received the funds from the conversion of Reynold’s 
cattle, but the receipt of those funds was made possible by Bennett’s cattle 
lease, which in turn was his compensation for serving as Corporation 
president.
            
Bennett argues there must be some “nexus between the act and the scope of 
the agent’s duties or the corporation’s authorization.” Generally, “[w]hen 
actions are taken by a vice-principal of a corporation, those acts may be deemed 
to be the acts of the corporation itself,” and “status as a vice-principal of 
the corporation is sufficient to impute liability to [the corporation] with 
regard to his actions taken in the workplace.”[95] We agree the 
Corporation cannot be liable for exemplary damages if the vice-principal’s 
misconduct occurred while he was acting in a personal capacity unrelated to his 
authority as a corporate vice-principal. But here, Bennett used corporate 
authority over corporate employees, on corporate land, to convert cattle using 
corporate equipment. There is ample evidence that Bennett was acting in a 
corporate capacity.
            
Section 41.005(c)(1) permits exemplary damages 
if the Corporation “authorized the doing and the manner of the act.” As a 
vice-principal acting in a corporate capacity, Bennett inarguably authorized and 
approved his own act of converting the cattle. The record is devoid of evidence 
that anyone else could have authorized it. The Corporation, therefore, 
authorized the doing and manner of the conversion, and Bennett’s conduct was 
chargeable to the Corporation for purposes of exemplary damages.
III. Conclusion
Robert 
Frost wrote elegantly of rural life, and made famous an old proverb: “Good 
fences make good neighbours,”[1] an apt aphorism for Texas cattle ranchers along 
the drought-prone Colorado River.
            
The Supreme Court has placed a constitutional fence around exemplary 
damages, one that lower courts must police to prevent the “acute danger of 
arbitrary deprivation of property.”[97] As the Court counseled almost a century 
ago, the power to award exemplary damages “is limited by the obligation to 
administer justice.”[98] We concede the 
constitutional lines are somewhat opaque, making the required balancing 
“necessarily unscientific.”[99] Indeed, the role of exemplary-damages 
“gatekeeper” has been called “one of the most challenging that has been placed 
upon appellate judges in civil cases.”[100] “[T]ime and 
again,”[101] though, the Supreme Court has 
disapproved of awards “that dwarf the corresponding compensatories.”[102]
            
We agree with the court of appeals that “Texans know better than to steal 
cattle,”[103] an offense once redressed beneath a 
tree rather than inside a courtroom. That said, the 
47:1 and 188:1 ratios here exceed the outermost limit permitted by due process. 
We thus remand to the court of appeals to reconsider exemplary damages in line 
with this opinion and prevailing ratio analysis.
 
__________________________________________
Don R. 
Willett
Justice
 
OPINION DELIVERED:  June 25, 2010








[1] Tex. Dept. of Agric., The Texas 
Livestock Industry: A Review of Current Economic Conditions 3 (2008), available at 
http://www.agr.state.tx.us/vgn/tda/files/1848/23296_Texas%20Livestock%20Industry%20Status.pdf.

[2] Id.; Tex. S. 
Res. 545, S. J. of Tex., 81st Leg., R.S. 829, 830 
(2009).

[3] 
Amid tough economic times, livestock crimes have 
risen in Texas, prompting the Legislature in 2009 to stiffen criminal penalties 
for stealing cattle and certain other livestock. See Act of May 12, 2009, 
81st Leg., R.S., ch. 139, § 1, 2009 Tex. Gen. Laws 
461, 462 (amending Tex. Pen. Code § 31.03(e)).

[4] See State Farm Mut. 
Auto. Ins. Co. v. Campbell, 
538 U.S. 408, 417–18 (2003).

[5] 
See generally Philip Morris USA v. 
Williams, 549 U.S. 346 (2007); State 
Farm, 538 U.S. 408; Cooper Indus., Inc. v. Leatherman Tool Group, 
Inc., 532 U.S. 424 (2001); BMW of N. Am., Inc. v. Gore, 517 U.S. 559 
(1996).

[6] 
As the court of appeals noted, San Saba County is 
an “open range” county, meaning ranchers are not required to fence in their 
cattle. 242 S.W.3d 866, 870.

[7] 
There is some uncertainty as to who owns the 
Corporation. Thomas Bennett produced two stock certificates, one for each 
daughter. But those certificates were not the first ones issued, and Bennett 
claimed he had lost all the other records.

[8] 
Reynolds insists that “Bennett attempted the 
despicable, trying to send the innocent victim of his crime to prison.” But 
Reynolds was never criminally charged, nor did he sue Bennett for besmirching 
his name. The matter was resolved swiftly and conclusively within 
hours.

[9] 
This was not uncommon; Reynolds noted a dozen-plus 
times when drought conditions facilitated cattle escapes, though he recovered 
most of the strays.

[10] TSCRA “is a 
grass roots organization composed of cattle producers and operators of all sizes 
located primarily in Texas and Oklahoma.” TSCRA Homepage, 
http://www.texascattleraisers.org/aboutTSCRA.asp (last visited June 21, 
2010). One of TSCRA’s services is stationing livestock theft 
investigators who are commissioned as special rangers by the Texas Department of 
Public Safety and “assist in recovering stolen livestock and equipment and 
apprehending the thieves.” Id.

[11] At the time, 
Section 31.03(e)(5)(A) of the Penal Code provided that 
stealing “10 or more head of cattle . . . stolen during a single transaction and 
having an aggregate value of less than $100,000” constituted a third-degree 
felony. Act of May 29, 1995, 74th Leg., R.S., ch. 318, 
§ 9, 1995 Tex. Gen. Laws 2734, 2738, amended by Act of May 12, 2009, 81st 
Leg., R.S., ch. 139, § 1, 2009 Tex. Gen. Laws 461, 
462. See also Tex. Civ. Prac. 
& Rem. Code § 41.008(c)(13) (exempting such 
conduct from the statutory caps on exemplary damages).

[12] 242 S.W.3d at 907.

[13] The 
applicable version of Section 41.003(a) made exemplary damages available if “the 
claimant proves by clear and convincing evidence that the harm with respect to 
which the claimant seeks recovery of exemplary damages results from . . . malice 
. . . .” Act of April 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110. Section 
41.001(7) defined malice as
 
(A) a specific intent by the 
defendant to cause substantial injury to the claimant; or
                
                
(B) an act or omission:
(i) which when viewed objectively from the standpoint of the 
actor at the time of its occurrence involves an extreme degree of risk, 
considering the probability and magnitude of the potential harm to others; 
and
(ii) of which the actor has 
actual, subjective awareness of the risk involved, but nevertheless proceeds 
with conscious indifference to the rights, safety, or welfare of 
others.
 
Id. at 109. 
The current version of Chapter 41 retains these requirements, although Section 
41.003 now provides that exemplary damages are available in cases of “malice” 
and “gross negligence.” “Malice” covers intentional torts where, under Section 
41.001(7), there is “a specific intent by the defendant to cause substantial 
injury or harm to the claimant,” essentially the same definition found in 
subpart (A) of the earlier version of Section 41.001(7) quoted above. “Gross 
negligence” is now defined in Section 41.001(11), using the same language found 
in subpart (B) of the earlier version of Section 41.001(7) quoted above. See Dillard Dep’t Stores, Inc. v. Silva, 148 S.W.3d 370, 373 
(Tex. 2004) (describing subpart (B) of the earlier version of Section 41.001(7) 
as “an alternative gross negligence component” of 
malice).

[14] Act of April 
11, 1995, 74th Leg., R.S., ch. 19, § 1, sec. 
41.001(7)(A), 1995 Tex. Gen. Laws 108, 
109.

[15] See Sw. 
Bell Tel. Co. v. Garza, 164 S.W.3d 607, 
609 (Tex. 2004) (“[I]n reviewing the legal sufficiency of evidence to support a 
finding that must be proved by clear and convincing evidence, an appellate court 
must ‘look at all the evidence in the light most favorable to the finding to 
determine whether a reasonable trier of fact could 
have formed a firm belief or conviction that its finding was true.’” (quoting 
In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002))).

[16] Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 310 (Tex. 2006).

[17] See Tex. Pen. Code 
§ 31.03(e)(5)(A).

[18] See id. 
§ 12.34.

[19] Tex. Civ. Prac. & Rem. 
Code § 41.008(c)(13).

[20] Barr v. City of Sinton, 295 S.W.3d 287, 301 (Tex. 
2009).

[21] Browning-Ferris Indus. of Vt. v. Kelco Disposal, Inc., 492 U.S. 257 (1989). Many academics argue the Excessive Fines Clause 
should apply, see, e.g., Stephen R. McAllister, A Pragmatic 
Approach to the Eighth Amendment and Punitive Damages, 43 U. Kan. L. Rev. 761 (1995), particularly given the 
“quasi-criminal” nature of exemplary damages, see, e.g., John Calvin 
Jeffries, Jr., A Comment on the Constitutionality of Punitive Damages, 72 
Va. L. Rev. 139, 151 (1986); Michael I. Krauss, Punitive 
Damages and the Supreme Court: A Tragedy in Five Acts, 2007 Cato Sup. Ct. 
Rev. 315, 323 (contending exemplary awards “cross the line to become 
public ordering and are therefore excessive fines”).

[22] Browning-Ferris, 492 U.S. at 276-77.

[23] Pac. Mut. 
Life Ins. Co. v. Haslip, 499 U.S. 1, 18 
(1991).

[24] Id.

[25] Id. at 
23–24.

[26] State Farm Mut. 
Auto. Ins. Co. v. Campbell, 
538 U.S. 408, 417 (2003).

[27] 517 U.S. 559 (1996).

[28] Id. at 568 
(internal quotation marks omitted); see also id. at 575, 580, 583.

[29] State Farm, 538 U.S. at 418.

[30] Gore, 
517 U.S. at 575.

[31] State 
Farm, 538 U.S. at 419; see also 
Gore, 517 U.S. at 576–77.

[32] State Farm, 538 U.S. at 419.

[33] Id.

[34] Id.

[35] Id. at 
422.

[36] Id. at 
424.

[37] Id. at 
422.

[38] Gore, 
517 U.S. at 579.

[39] Restatement (Second) of 
Torts § 908 cmt. e (1979).

[40] The Court 
explained:
 
A defendant’s dissimilar acts, independent from the acts 
upon which liability was premised, may not serve as the basis for punitive 
damages. A defendant should be punished for the conduct that harmed the 
plaintiff, not for being an unsavory individual or business. Due process does 
not permit courts, in the calculation of punitive damages, to adjudicate the 
merits of other parties’ hypothetical claims against a defendant under the guise 
of the reprehensibility analysis . . . .
 
State Farm, 538 
U.S. at 422-23.

[41] 549 U.S. 346, 355 (2007). In today’s case, the conversion and related conduct 
inflicted no actual harm on third parties, only alleged potential or theoretical 
harm, and all redressable in other civil or criminal 
proceedings.

[42] Id. at 353, 
355.

[43] Justice 
Stevens voiced a similar reaction: “This nuance eludes me. When a jury increases 
a punitive damages award because injuries to third parties enhanced the 
reprehensibility of the defendant’s conduct, the jury is by definition punishing 
the defendant—directly—for third-party harm.” Id. at 
360 (Stevens, J., dissenting). See also Erwin Chemerinsky, More Questions About Punitive Damages, 
Trial, May 2007, at 72, 72 
(“Trial judges are likely to struggle for years with formulating jury 
instructions that simultaneously tell the jury to consider and not 
consider harm to people other than the plaintiffs.”); Michael P. Allen, Of 
Remedy, Juries, and State Regulation of Punitive Damages: The Significance of 
Philip Morris v. Williams, 63 N.Y.U. 
Ann. Surv. Am. L. 343, 359 (2008) (“I have read 
this passage scores of times. . . . How can the jury 
consider conduct toward others to determine reprehensibility but not to punish 
the defendant?”).

[44] State Farm, 538 U.S. at 422.

[45] See 
Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 46 (Tex. 
1998).

[46] See 
Gore, 517 U.S. at 577; Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 309 & 
n.48 (Tex. 2006).

[47] 538 U.S. at 425. The Court derived a 4:1 ratio from the 700-year-long 
Anglo-American tradition of lawmakers imposing “double, treble, or quadruple 
damages to deter and punish.” Id.

[48] 212 S.W.3d 299 (Tex. 2006).

[49] Id. at 
308.

[50] Id.

[51] Id. (quoting 
State Farm, 538 U.S. at 425).

[52] Id. at 
309.

[53] Id. at 310 
(footnote omitted).

[54] As noted 
above, there was testimony about a single incident where one of Bennett’s 
employees attempted to threaten Larry Grant. However, the phone call was made to 
the wrong number, reaching Grant’s brother-in-law instead. The employee, Don 
Rogers, flatly denied ever threatening Grant. The brother-in-law, Mack Maxcey, either did not take the call seriously or was not 
intimidated, telling Rogers to “quit talking and start the bodily harm.” 
Reynolds points to no proof that the misdirected threat was ever communicated to 
Grant himself or, if so, that Grant took it seriously, or that Rogers seriously 
intended to carry out the threat. In short, this incident concerns a single 
alleged phone call threat from a Bennett employee that (1) the employee 
vigorously denied ever making, (2) was botched in that it was made to the wrong 
person, (3) was apparently discounted by the person who received the call, and 
(4) apparently never reached Grant, the intended target. This evidence does not 
meaningfully implicate the second reprehensibility factor — that the defendant’s 
conduct showed indifference to or reckless disregard for the health or safety of 
others.

[55] As described 
above, Reynolds complains of a course of conduct, but the only harm for which he 
sued and recovered damages was the single act of conversion of his cattle. 
Similarly, the plaintiff in Gullo Motors 
complained of a course of conduct by the defendant that included forging 
documents, a failure to install promised items, and various representations by 
and confrontations with the defendant’s agents, see 212 S.W.3d at 316–17 
(O’Neill, J., dissenting), but we nevertheless held that the conduct “did not 
involve repeated acts,” id. at 308, because that 
factor “refers to recidivism,” id. at 309. The 
alleged course of conduct in today’s case resulted in a single economic loss to 
Reynolds and under Gullo Motors it did 
not involve repeated, recidivist acts under the fourth reprehensibility 
factor.

[56] State 
Farm, 538 U.S. at 425 (quoting 
Gore, 517 U.S. at 582).

[57] 242 S.W.3d at 904.

[58] Id. (“This is 
such a case.”).

[59] State 
Farm, 538 U.S. at 425 
(quoting Gore, 517 U.S. at 582).

[60] See Int’l 
Bhd. of Elec. Workers v. Foust, 442 
U.S. 42, 50 n.14 (1979) (“[I]t cannot be ignored that punitive damages may be 
employed to punish unpopular defendants.”).

[61] Lincoln v. 
Case, 340 F.3d 283, 287, 294–95 (5th 
Cir. 2003) (remitting the jury’s $100,000 exemplary-damages award to 
$55,000).

[62] Williams 
v. Kaufman County, 343 F.3d 689, 711 
& n.75 (5th Cir. 2003) (affirming exemplary damages of 
$15,000).

[63] Lincoln, 340 F.3d at 293.

[64] Gore, 
517 U.S. at 582.

[65] Lincoln, 340 F.3d at 294.

[66] Williams, 343 F.3d at 711.

[67] State Farm, 538 U.S. at 419-20.

[68] Today’s case 
is also qualitatively different from a notable case that upheld a 37:1 ratio 
based on “particularly reprehensible” conduct. In Mathias v. Accor Economy 
Lodging, Inc., Judge Posner wrote for the Seventh Circuit in affirming 
$186,000 in punitive damages, more than 37 times the $5,000 actual damages. 
347 F.3d 672 (7th Cir. 2003). A brother and sister were 
bitten by bedbugs while staying at a downtown Chicago hotel. The hotel had known 
about the bedbug infestation for years, rejected a $500 bid to exterminate, and 
told desk clerks to pass off the bedbugs as ticks. The jury found the hotel’s conduct “willful and wanton,” and the court of 
appeals deemed it “outrageous,” saying the infestation reached “farcical 
proportions” and that infested rooms were rented nightly to unsuspecting 
customers despite being on “Do not rent, bugs in room” status. Id. at 674–75, 677. As Judge Posner noted, it was 
probably no coincidence that the $191,000 total award per plaintiff amounted to 
$1,000 for each of the hotel's 191 rooms. Id. at 
678.
                
This bedbug case differs significantly from today’s cattle case. The 
bedbugs preyed on unwary guests nightly, leaving them with painful and unsightly 
red welts and bites — all told, countless health-endangering episodes that could 
have ended years earlier with a quick $500 
extermination. The hotel recklessly disregarded and lied about a known health 
risk, deliberately exposing its guests to an insect infestation, conduct that 
“amounted to fraud and probably to battery as well.” Id. 
at 675.

[69] Gullo 
Motors, 212 S.W.3d at 
310.

[70] State Farm, 538 U.S. at 418.

[71] Many courts 
exclude the “comparable sanctions” factor altogether once they conclude the 
ratio violated due process. E.g., Rubinstein v. Adm’rs of the Tulane Educ. Fund, 218 F.3d 392, 408 (5th 
Cir. 2000) (“Having found that the award fails to satisfy the second 
requirement, we need not examine the third prong of the BMW test.”); 
Borne v. Haverhill Golf & Country Club, Inc., 791 N.E.2d 903, 916–17 
(Mass. App. 2003) (considering only the first and second guideposts); McClain 
v. Metabolife Int’l, Inc., 259 F.Supp.2d 1225 
(N.D. Ala. 2003) (ignoring comparable sanctions).

[72] Gore, 517 U.S. 
at 583 (internal quotation marks omitted).

[73] Some 
commentators argue that comparing economic sanctions with jail time “would 
effectively eviscerate” the guidepost altogether because “[a]ny nontrivial potential term of imprisonment would likely 
justify almost any size punitive damages awards.” Steven L. Chanenson & John Y. Gotanda, The Foggy Road for 
Evaluating Punitive Damages: Lifting the Haze from the Gore/State Farm 
Guideposts, 37 U. Mich. J.L. Reform 441, 479-80 
(2004).

[74] 242 S.W.3d at 906 (citing Tex. Pen. Code §§ 
31.03(e)(5)(A) and 12.34).

[75] Id. (citing 
Tex. Pen. Code §§ 36.05 and 
12.35).

[76] State 
Farm, 538 U.S. at 428 (citing 
Gore, 517 U.S. at 583, and Haslip, 499 
U.S. at 23).

[77] Id.

[78] Id.

[79] Id.

[80] See State 
Farm, 538 U.S. at 425; Gore, 517 U.S. at 581 
& n.33.

[81] See 
supra note 11.

[82] Tex. Pen. Code § 12.34(b). Interestingly, stealing 100 head of cattle (or 
theoretically, even 1,000) is criminally no riskier than stealing ten so long as 
the value remains less than $100,000. And while incarceration ratchets up for 
higher-grade felonies involving higher-dollar losses, the maximum fine for 
first- and second-degree felonies remains $10,000. Id. 
§§ 12.32–.33. Also, outside the context of cattle and certain other 
animals, third-degree felony theft only applies to property worth at least 
$20,000. Id. § 31.03(e)(5). If stolen cattle 
were treated like other stolen property, the thief would sometimes face less 
jail time. For example, if someone converts not cattle worth $5,327.11 but a 
Remington cattle sculpture worth $5,327.11, he would confront not a 
third-degree felony but a less-serious state jail felony (180 days to two years 
in state jail), though the same potential $10,000 fine would apply. Id. § 12.35. And once the “third-degree” label 
attaches, stealing $99,999.99 worth of cattle is criminally no worse than 
stealing $99,999.99 worth of cattle feed.

[83] Tex. Civ. Prac. & Rem. 
Code § 41.008(c)(13).

[84] 242 S.W.3d at 906.

[85] Tex. Civ. Prac. & Rem. Code § 
41.008(b).

[86] Two 
commentators argue that the highest comparable fine should set a presumptive 
limit on punitive damages. Chanenson & Gotanda, supra note 73, at 444. By 
“setting the statutory maximum fine that fixes the presumptive limit, the 
relevant legislature has spoken to the misconduct’s reprehensibility 
already.” Id. at 478. However, capping 
exemplary damages at the $10,000 maximum fine may seem disproportionately low in 
certain high-dollar contexts — for example, in a case of first-degree felony 
theft where the property stolen is worth $200,000 or more. See Tex. Pen. Code 
§§ 12.32(b), 31.03(e)(7).

[87] Gullo 
Motors, 212 S.W.3d at 309 (quoting 
Gore, 517 U.S. at 575).

[88] See 
id. at 307; Gasperini v. Ctr. for Humanities, Inc., 518 
U.S. 415, 430 n.12 (1996); Owens-Corning Fiberglas Corp. v. Malone, 972 
S.W.2d 35, 45 (Tex. 1998) (“[E]ven if an assessment of 
punitive damages is not deemed excessive under governing state law, it may 
violate a party’s substantive due process right to protection from ‘grossly 
excessive’ punitive damages awards.” (quoting 
Gore, 517 U.S. at 568)).

[89] Gullo 
Motors, 212 S.W.3d at 
310.

[90] State Farm, 538 U.S. at 429.

[91] In re 
Merrill Lynch Trust Co. FSB, 235 S.W.3d 
185, 188 (Tex. 2007).

[92] 958 S.W.2d 387, 391 (Tex. 1997).

[93] 998 S.W.2d 605, 618 (Tex. 1999) (citation 
omitted).

[94] 297 S.W.3d 
248, 250 n.1 (Tex. 2009) (quoting Hammerly 
Oaks, 958 S.W.2d at 391).

[95] Bruce, 998 S.W.2d at 618.

[96] Robert Frost, Mending Wall, in North of Boston 11, 12 (Henry Holt 
& Co. 1917) (1914).

[97] Honda 
Motor Co. v. Oberg, 512 U.S. 415, 432 n.10 (1994).

[98] Standard Oil Co. of Ind. v. Missouri, 224 U.S. 270, 286 (1912).

[99] Williams 
v. Kaufman County, 343 F.3d 689, 712 n.77 (5th Cir. 2003).

[100] Inter 
Med. Supplies, Ltd. v. EBI Med. Sys., Inc., 181 F.3d 446, 450 (3rd Cir. 
1999).

[101] TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 475 (1993) (O’Connor, J., 
dissenting).

[102] Exxon 
Shipping Co. v. Baker, 128 S. Ct 2605, 
2625 (2008).

[103] 242 S.W.3d at 907.




[1] 
 Robert Frost, Mending Wall, in North of Boston 11, 12 (Henry Holt & 
Co. 1917) (1914).