United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 7, 2003**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 02-30333

LISA LINCOLN; ET AL,

Plaintiffs,

DON C. WEAVER,

Plaintiff-Appellee,

versus

WALTER R. CASE, ET AL,

Defendants,

WALTER R. CASE,

Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, Chief Judge, REAVLEY and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

A jury found that the Defendant Walter Case ("Case") violated provisions of the Fair Housing

Act ("FHA") and awarded the Plaintiff Don Weaver ("Weaver") compensatory and punitive

damages. Case raises three issues on appeal: (1) the district court lacked subject matter jurisdiction, (2) Weaver lacked standing to sue, and (3) the district court erred by not reducing or eliminating the punitive damages award. For the following reasons, we affirm in part, reverse in part and remit the punitive damages award to $55,000.

## FACTUAL AND PROCEDURAL BACKGROUND

Case and his wife Rita Case ("Mrs. Case") own a home at 840 Louque Place in the Lakeview area of New Orleans which they have been renting since 1971. The home was converted into four rental apartments, 840 and 842 Louque Place (the upstairs units), and 5454 and 5458 General Diaz (the downstairs units). Beginning in 1998, the downstairs units were repaired and renovated for a period of over 12 months. By November 1999, the apartment at 5458 General Diaz was ready and available for rent.

The Cases ran an ad in the New Orleans Times-Picayune advertising an apartment for rent at $550 per month. Several people called to inquire about the apartment and Case told the callers to meet him at the apartment between 10:30a.m. and 11:00a.m. on November 26, 1999, the Friday after Thanksgiving. He contends that he showed the apartment to approximately eight to ten people at that time, and that he indicated to those people that he had a deposit on the apartment. According to Case, he agreed to rent the apartment to his daughter, Deanna Case, in early November 1999 because the home she was renting at the time was being sold. Case asserts that Deanna Case gave him a cash deposit of $500 on November 20, 1999. Case asserts that he left the property after showing it on the morning of November 26, 1999, and did not return later in the afternoon. Specifically, Case denies ever having an encounter with Weaver and his girlfriend Lisa Lincoln ("Lincoln") at the apartment later that day.

2

Weaver and Lincoln were a biracial couple looking for a new apartment. Weaver is African-American and Lincoln is Japanese-American. Lincoln claims that on the morning of November 26, 1999, she called the number listed by the Cases in the newspaper ad to inquire about the apartment for rent. According to Lincoln, she and Case had a friendly conversation and he told her: "Drive by. If you like it, give me a call, at least you can see the inside of it." Lincoln claims that Case never mentioned that he was holding a deposit on the apartment during that phone conversation.

According to Lincoln and Weaver, the following events transpired later that afternoon. Lincoln and Weaver allege they drove by the property, liked it, and called the telephone number listed in the ad once again using a cell phone to arrange to see the inside of the apartment. Lincoln contends that Mrs. Case answered and indicated that her husband was already on his way to the property and would arrive shortly. When Case drove up, Lincoln and Weaver got out of their car and stood in front of the front door arm-in-arm, under the awning. Numerous "for rent" signs were posted nearby. After seeing Lincoln and Weaver, Case walked away from the couple. Lincoln went after Case and he told her "I wish you would have called. I would have told you that I was holding a deposit. I have a deposit on the apartment." At Lincoln's request, Case nevertheless showed the couple the inside of the apartment. Case claims there were no showings that afternoon and that the allegations of discrimination asserted by Weaver and Lincoln were concocted.

On the following Monday, Lincoln asked a Caucasian co-worker to call the Cases and inquire into the availability of the apartment. A woman answered the call and indicated that the apartment was available "[b]ut you need to speak to my husband." Lincoln then contacted the Greater New Orleans Fair Housing Action Center, Inc. ("FHAC"). The FHAC assigned two African-American testers and two Caucasian testers to inquire about the availability of the apartment. Beginning

3

December 8, 1999, the testers contacted the Cases by telephone. Essentially, each of the Caucasian testers was told the apartment was available, while the African-American testers were told it was unavailable.

Lincoln and Weaver filed suit against the Cases alleging violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., as well as 42 U.S.C. §§ 1981 and 1982, and state discrimination laws. The Cases moved for summary judgment which the district court dismissed as untimely filed. A few days before trial, the district court granted Lincoln and Weaver's motion to dismiss their civil rights claims and state law claims, as well as all of their claims against Mrs. Case. The remaining claims against Case were tried before a jury and the jury found in favor of Lincoln and Weaver. The jury awarded no damages to Lincoln, but awarded $500 in compensatory damages and $100,000 in punitive damages to Weaver.

Case filed two post-trial motions: a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 60(b)(4), and a motion for judgment N.O.V. pursuant to Rule 50(b), alternatively a motion for a new trial pursuant to Rule 59(a), and/or in the alternative for a remittitur. The district court denied both motions, as well as a subsequent motion for reconsideration. Case appeals, contending that: (1) the district court lost subject matter jurisdiction once Lincoln and Weaver dismissed their civil rights claims, (2) Weaver lacked standing to sue under the FHA, and (3) the district court erred in failing to reduce or eliminate the punitive damages award.

DISCUSSION

I.    Subject Matter Jurisdiction

"The issue of subject matter jurisdiction is subject to plenary review by an appellate court." Julian v. City of Houston, 314 F.3d 721, 725 (5th Cir. 2002).

Weaver and Lincoln allege that Case violated two provisions of the FHA, 42 U.S.C. § 3604(a) and (d) by refusing to rent, and by misrepresenting unavailability, based on Weaver's race. Section 3604 states as follows:

> As made applicable by section 803 [42 U.S.C. § 3603] and except as exempted by sections 803(b) and 807 [42 U.S.C. §§ 3603(b), 3607], it shall be unlawful -
>
> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.
>
> * * *
>
> (d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

Case argues that the district court lacked subject matter jurisdiction because the FHA did not apply to either Case or the property at issue.[1] Specifically, Case argues that he qualifies for an exemption from the strictures of the FHA pursuant to 42 U.S.C. § 3603(b)(1). Weaver contends that Case misinterprets the exemption. We agree.

Section 3603(b)(1) provides an exemption for "any single-family house sold or rented by an owner" provided that four requirements are satisfied.[2] We need not address whether Case meets the

---

[1] A "dwelling" is defined under the FHA as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families. . . ." 42 U.S.C. § 3602(b). The parties agree that Case's rental property is a "dwelling" within the meaning of the FHA.

[2] Section 3603(b) states as follows:

**Exemptions**. Nothing in section 804 [42 U.S.C. § 3604] (other than subsection (c)) shall apply to -

5

four requirements because we find that the fourplex at issue is not a "single-family house." Thus, we find that Case does not meet the threshold qualification for the § 3603(b)(1) exemption.

The FHA does not define "single-family house." Case cites to Lamb v. Sallee, 417 F. Supp. 282 (E.D. Ky. 1976) and Hogar Agua Y Vida En El Desierto v. Suarez-Medina, 36 F.3d 177 (1st Cir. 1994) as relevant to the proper interpretation of "single-family house." Although these cases are informative, neither supports a finding that Case meets the threshold requirement for a § 3603(b)(1) exemption. In Lamb, it was undisputed that the property in question was a single-family house. In determining whether the owner owned more than three other "such single-family houses," for purposes of determining whether the remaining requirements of the § 3603(b)(1) exemption were met, the district court held that a duplex was not a single-family house within the meaning of § 3603(b)(1). Thus, Lamb does not support Case's contention that his fourplex was a "single-family

---

(1) any single-family house sold or rented by an owner: *Provided*, That such private individual owner does not own more than three such single-family houses at any one time: *Provided further*, That in the case of the sale of any such single-family house by a private individual owner not residing in such house at the time of such sale or who was not the most recent resident of such house prior to such sale, the exemption granted by this subsection shall apply only with respect to one such sale within any twenty-four month period: *Provided further*, That such bonafide private individual owner does not own any interest in, nor is there owned or reserved on his behalf, under any express or voluntary agreement, title to or any right to all or a portion of the proceeds from the sale or rental of, more than three such single-family houses at any one time: *Provided further*, That after December 31, 1969, the sale or rental of any such single-family house shall be excepted from the application of this title only if such house is sold or rented (A) without the use in any manner of the sales or rental facilities or the sales or rental services of any real estate broker, agent, or salesman, or of such facilities or services of any person in the business of selling or renting dwellings, or of (B) without publication, posting or mailing, after notice, of any advertisement or written notice in violation of section 804(c) of this title [42 U.S.C. § 3604(c)]; but nothing in this proviso shall prohibit the use of attorneys, escrow agents, abstractors, title companies, and other such professional assistance as necessary to perfect or transfer the title, or
(2) rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence.

6

house." In Hogar Agua, the First Circuit noted that the district court had found that the two-story house at issue, comprised of separately equipped single-family apartments on each floor, constituted a single-family house. 36 F.3d at 180. The defendant and his family lived primarily in one apartment, while his son lived in the other. Id. Due to physical impairments, however, the defendant lived "interchangeably" in both apartments. Id. In this case, the residents of Case's property were not members of an extended family, living amongst all of the four apartments.[3]

As the district court stated in this case, "it seems real clear [that] under the black letter law . . . this piece of property was not a single family dwelling, so it does not get to the exception." We agree. Thus, we reject Case's argument that the district court lacked subject matter jurisdiction.

II.     Standing Under the FHA

This Court reviews Case's standing challenge de novo. Maiz v. Virani, 311 F.3d 334, 338 (5th Cir. 2002).

The Supreme Court has stated that "[s]tanding is a jurisdictional requirement that focuses on the party seeking to get his or her complaint before a federal court and not on the issues he or she wishes to have adjudicated." United States v. Hays, 515 U.S. 737, 742-43 (1995). The FHA affords a private cause of action to any "aggrieved person." 42 U.S.C. § 3613(a)(1)(A). An "aggrieved person" includes any person who "(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i). The Supreme Court has held that the sole requirement for standing under the FHA is the Article III minima. Havens Realty Corp. v. Coleman, 455 U.S. 363,

_____

[3] Moreover, the First Circuit did not analyze the district court's finding that the property was a single-family house because that particular finding was not challenged on appeal.

372 (1982); see also San Pedro Hotel Co. v. City of Los Angeles, 159 F.3d 470, 475 (9th Cir 1998).

Three elements are required to establish Article III standing:

> First, the plaintiff must have suffered an injury in fact - an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Hays, 515 U.S. at 742-43.

Case argues that Weaver does not have standing to sue for violations of his rights under 42 U.S.C. § 3604(d) (misrepresentation of unavailability) because Weaver does not assert that a misrepresentation was made to him *personally*. Case contends that the only alleged deception concerning the apartment's availability occurred during conversations between he and Lincoln, and Mrs. Case and Lincoln. Weaver asserts that the fact that Case's words evidencing the deception appear to have been directed toward Lincoln personally does not impact his standing to sue. We agree. Lincoln inquired into the availability of the apartment for both she and Weaver, in essence, she was the spokesperson for the couple. Weaver was present when the apartment suddenly became unavailable. The fact that Case's words may have been physically directed toward Lincoln is of no importance. It does not diminish Weaver's injury, nor the fact that Weaver's injury can be "fairly traceable" to Case's actions. See James v. City of Dallas, 254 F.3d 551, 564 (5th Cir. 2001) ("Causation requires that the injury be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.") (internal quotation marks omitted). Thus, we reject Case's argument that Weaver lacked standing to sue.

III.    Punitive Damages

8

After the trial, Case filed a motion for judgment N.O.V. pursuant to Federal Rule of Civil Procedure 50(b), alternatively a motion for a new trial pursuant to Rule 59(a), and/or in the alternative for a remittitur. The district court heard the parties' arguments and denied each of Case's requests without a written opinion. Weaver now asserts a myriad of challenges to the district court's refusal to eliminate or reduce the punitive damages award.

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." Coffel v. Stryker Corp., 284 F.3d 625, 630 (5th Cir. 2002) (internal quotations omitted). We review the district court's ruling on a motion for judgment as a matter of law de novo, applying the same legal standard as the district court. Id. In this case, however, we review Case's sufficiency of the evidence arguments only for plain error because Case failed to properly preserve his challenges to the legal sufficiency of the evidence to support a punitive damages award. See Flowers v. Regional Physician Svs., 247 F.3d 229, 238 (5th Cir. 2001) ("If a party fails to move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on an issue at the conclusion of all of the evidence, that party waives both its right to file a renewed post-verdict Rule 50(b) motion and also its right to challenge the sufficiency of the evidence on that issue on appeal.").[4] Under plain error review, we must decide "whether there

---

[4] The record reflects that Case moved for a directed verdict at the close of Weaver and Lincoln's case, and he renewed this motion at the close of all the evidence, on the grounds that Weaver and Lincoln failed to establish their burden of proof that Case lied when he said that he already had a deposit on the apartment. He did not urge then, as he does now, that there was insufficient evidence to support an award of punitive damages. Furthermore, Case failed to object to the submission of a punitive damages instruction to the jury. See Barber v. Nabors Drilling U.S.A., Inc., 130 F.3d 702, 710 (5th Cir. 1997) (reviewing the defendant's argument that there was insufficient evidence to support a punitive damages award for plain error where the defendant did not urge insufficiency of the evidence on the issue of punitive damages in its pre-verdict Rule 50 motions, nor object to the submission of a punitive damages instruction).

9

was any evidence to support the jury verdict." Flowers, 247 F.3d at 238. "If any evidence exists that supports the verdict, it will be upheld." Id. With respect to Case's motion for a new trial under Rule 59 and his motion for remittitur, we review the district court's denial of both for abuse of discretion. Industrias Magromer Cueros Y Pieles S.A. v. La. Bayou Furs, 293 F.3d 912, 918 (5th Cir. 2002); Thomas v. Tex. Dep't of Criminal Justice, 297 F.3d 361, 368 (5th Cir. 2002). "There is no . . . abuse of discretion unless there is a complete absence of evidence to support the verdict." 293 F.3d at 924 (quoting Sam's Style Shop v. Cosmos Broadcasting Corp., 694 F.2d 998, 1006 (5th Cir. 1982)). Finally, we review Case's constitutional challenge to the size of the punitive damages award de novo. Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 436 (2001).

Case contends that the district court erred in allowing the punitive damages award to stand because there was no evidence showing a "willful and gross disregard" for the plaintiff's rights, and no evidence demonstrating Case's "subjective consciousness" that he was violating a statute which subjected him to punitive damages. In a civil action to enforce the FHA, "if the court finds that a discriminatory housing practice has occurred . . . the court may award to the plaintiff actual and punitive damages." 42 U.S.C. § 3613(c)(1). Case appears to argue that the district court was confused regarding the requisite showing necessary to obtain punitive damages in FHA cases.[5] In La.

---

[5] Case argues that the district court in this case was "obviously misled" by the inconsistency between this Court's decision in Woods-Drake v. Lundy, 667 F.2d 1198, 1203 (5th Cir. 1982) and La. ACORN Fair Housing v. LeBlanc, 211 F.3d 298 (5th Cir. 2000). We disagree. Woods-Drake and La. ACORN Fair Housing are not inconsistent, and neither espoused the requisite showing necessary to obtain punitive damages under the FHA. In Woods-Drake v. Lundy, this Court held that the district court's refusal to award punitive damages was clearly erroneous because "[c]learly, [the defendant's] behavior amounts to a willful and gross disregard of plaintiff's rights under Section 1982 and the Fair Housing Act." 667 F.2d 1198, 1203 (5th Cir. 1982). In Woods-Drake, it appears that the Court used the phrase "willful and gross disregard for plaintiff's rights" to characterize the evidence in that case, rather than to enunciate a threshold test for punitive damages under the FHA. In La. ACORN Fair Housing, we specifically did not reach the issue. 211 F.3d at 303 n.3.

10

ACORN Fair Housing, this Court held that a punitive damages award under the FHA cannot stand absent an actual damages award, unless there was a violation of a constitutional right. 211 F.3d at 303. In doing so, we specifically did not decide "whether a punitive damage award under the FHA must be based on egregious conduct or merely predicated on a violation of the statute. See generally Kolstad v. Am. Dental Ass'n, 527 U.S. 526 (1999)." Id. at 303 n.3.

In Smith v. Wade, the Supreme Court held that a jury may award punitive damages in a federal civil rights action based on 42 U.S.C. § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." 461 U.S. 30, 56 (1983). In Kolstad, which involved a Title VII action, the Supreme Court rejected a requirement that the conduct be egregious in order to support a punitive damages award, but held that "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." 527 U.S. at 536-37. As the Supreme Court explained, the existence of intentional discrimination may not always give rise to punitive damages because the defendant may be "unaware of the relevant prohibition" or the defendant may discriminate "with the distinct belief that [his] discrimination is lawful." Id. Three of our sister Circuits have held that the standard for punitive damages in a federal civil rights action, as delineated in Smith and Kolstad, is applicable in the context of the FHA. See Preferred Properties, Inc. v. Indian River Estates, 276 F.3d 790, 800 (6th Cir. 2002), cert. denied, 122 S. Ct. 2663 (2002); Badami v. Flood, 214 F.3d 994, 997 (8th Cir. 2000); Alexander v. Riga, 208 F.3d 419, 430-32 (3d

Case also makes a broad argument that the "district court refused to examine [the] 200-fold punitive damages award, citing what it termed unsettled law." (emphasis in original). Although the district court did not issue a written opinion, it is apparent from the district court's many insightful comments during the post-trial motions hearing that it closely examined the punitive damages award.

11

Cir. 2000). Consistent with our sister Circuits, we are persuaded that "the question for the availability of punitive damages is whether the defendant[] acted with malice or reckless indifference that [his] actions might violate a federal statute of which [he was] aware." Preferred Properties, Inc., 276 F.3d at 800 (internal quotation marks omitted). Thus, we find that the district court applied the proper standard.

We further find that there was sufficient evidence to support an award of punitive damages. The jury found that Weaver's race was a motivating factor behind Case not renting the apartment to Lincoln and Weaver. The jury was further persuaded that Case misrepresented the unavailability of the apartment and that Weaver's race was a motivating factor in that misrepresentation. There can be little doubt that Case, an experienced landlord, knew that discriminating against prospective tenants based on race violated federal law, and has for over 30 years. Indeed, Case's defense at trial was that he did not discriminate at all, not that he was ignorant of the law prohibiting race discrimination in housing. The jury concluded that Case acted "maliciously, wantonly, oppressively, or intentionally with respect to violating Mr. Weaver's rights under the Fair Housing Act" and awarded Weaver punitive damages accordingly. We are convinced that there was evidence, indeed legally sufficient evidence, to support the jury's verdict.[6]

---

[6] Case further contends that the punitive damages award cannot be upheld in this case because the $500 compensatory damages award was really a "nominal damages" award. See La. ACORN Fair Housing, 211 F.3d at 303 (permitting punitive damages only where there was an award of actual damages, absent a constitutional violation). We disagree. As Weaver points out, the jury specifically found that Case's violations of the FHA proximately caused damages in the amount of $500. Weaver further asserts that the jury knew the difference between compensating for an actual loss, versus no loss, because the jury awarded no damages to Lincoln. Moreover, the sole question posed by the jury during deliberations was whether "we have to award money to the Plaintiff or can we see to it that he get Med. help for his pain?" Weaver argues that this question indicates that the jury compensated Weaver for his injuries. Finally, because $500 is much larger than a typical nominal damages award of $1, Weaver contends that it is reasonable to infer that the compensatory damages were in fact

12

Case further argues that the punitive damages award was constitutionally excessive under BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996) and this Court's decision in Watson v. Johnson Mobile Homes, 284 F.3d 568 (5th Cir. 2002). In Gore, the Supreme Court outlined three guideposts courts should consider in determining whether a punitive damages award is unconstitutionally excessive: the degree of the defendant's reprehensibility or culpability; the disparity between the harm or potential harm suffered by the victim and the punitive damages award; and the sanctions authorized or imposed in other cases for comparable misconduct. 517 U.S. at 574-75; see also Cooper Indus., Inc. v. Leatherman Toolgroup, Inc., 532 U.S. 424, 434-35.[7] Recently, the Supreme Court reiterated the importance of the Gore guideposts, explaining that "[e]xacting appellate review ensures that an award of punitive damages is based upon an 'application of law, rather than a decisionmaker's caprice.'" State Farm Mutual Auto. Ins. Co. v. Campbell, 123 S. Ct. 1513, 1520-21 (2003) (quoting Cooper Indus., 532 U.S. at 436).[8]

---

awarded to compensate Weaver for actual damages. After reviewing the record, we are persuaded that the $500 compensatory damages award was just that, a compensatory damages award.

  [7] Case contends that the district court did not apply the factors outlined in Gore because this was a discrimination case. We disagree. In light of the district court's numerous specific references to the factors during the post-verdict motions hearing, we are persuaded that the district court duly considered the Gore factors.
  Case further asserts that the district court imposed an inverse evidentiary burden on him by requiring a showing of a past pattern of non-discrimination. Again, this misinterprets the district court's comments during the post-verdict motions hearing. In an attempt to discern the degree of reprehensibility, the district court compared what the court would look at in an employment discrimination case versus what might be available to consider in a housing discrimination case. During this discussion, the district court noted that Case did not "have evidence of past pattern of non-discrimination." The district court did not place an inverse evidentiary burden on Case.

  [8] In Campbell, the Supreme Court found that the punitive damages award of $145 million "was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant." 123 S. Ct. at 1526. The Supreme Court's decision to reverse rested, in large part, on the fact that the award was based substantially on the defendant's out-

13

Regarding the first of the Gore guideposts, Case argues that he did not act reprehensibly *at all*, thus this factor should weigh in his favor. We cannot agree. Unbelievably, Case asserts that it was Lincoln who acted reprehensibly because she did not call back after December 1 to check on the apartment's availability. Case attempts to wholly disavow *any* reprehensible conduct on his part. In effect, Case attempts to undermine the validity of the jury's findings on liability even though he does not challenge those findings on appeal. In light of the jury's verdict and the evidence in the record, we readily conclude that Case's actions in discriminating in housing based on Weaver's race were reprehensible. See Bogle v. McClure, ___ F.3d ___, 2003 WL 21297118 (June 6, 2003 11th Cir.) ("Repeatedly, courts have found intentional discrimination to be reprehensible conduct under Gore's first guidepost."). As to the degree of reprehensibility:

> Conduct involving violence or threats of violence is obviously more shocking than that which causes only economic harm. Similarly, trickery and deceit are more deserving of sanction than mere negligence. And a wrong that is part of a larger pattern of misconduct is more blameworthy than a single, isolated malfeasance. [Finally,] taking advantage of someone who is relatively unsophisticated or financially vulnerable is particularly deserving of rebuke.

Watson, 284 F.3d at 572 (citing Gore, 517 U.S. at 575-77). Although Case's behavior did not include violence or threats of violence, the import of Case's actions in discriminating against Weaver based on his race caused more than mere economic injury, as was evident in the trial testimony. Furthermore, Case's actions in misrepresenting the unavailability of the apartment involved trickery

---

of-state conduct that may have been lawful where it occurred and on conduct that was not related to the plaintiff's harm. Id. at 1521-25. As the Supreme Court stated, its "concerns are heightened when the decisionmaker is presented . . . with evidence that has little bearing as to the amount of punitive damages that should be awarded." Id. at 1520. Under the facts of this case, we have no such heightened concern.

and deceit. In light of the testimony of the testers, it also appears that Case's discrimination against Weaver was part of a larger pattern of misconduct.

Under Gore, we next consider the relationship of the penalty (the punitive damages) to the harm caused (the compensatory damages). Case argues that any ratio of compensatory damages to punitive damages greater than 10:1 *requires* remittitur. We disagree. In Watson, this Court stated that "[t]here is no particular disparity between punitive and actual damages that will automatically result in our declaring a punitive damages award unconstitutional." 284 F.3d at 573. Although the Supreme Court recently reminded lower courts of appeal that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," it once again declined to impose "a bright-line ratio which a punitive damages award cannot exceed." Campbell, 123 S. Ct. at 1524. As we explained in Watson, the ratio merely gives the Court "an idea whether the size of the award is suspect." 284 F.3d at 573.

Weaver contends that in housing discrimination cases, in contrast to employment discrimination cases, the victims may never incur extra housing expenses, or they may incur so little in compensatory damages that they may not take the steps necessary to combat the discrimination. Weaver contends that the ratio in this case is justifiable given the "inherently low or hard-to-determine actual injuries" in housing discrimination cases and the important goal of deterring future wrongdoing. We find Weaver's arguments persuasive. A high ratio of punitives to compensatory damages is far less troubling in cases such as this one. See Campbell, 123 S. Ct. at 1524 ("[B]ecause there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages.") (internal quotation marks omitted). As

the Supreme Court recently restated, a higher ratio may be needed where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." Id. (quoting Gore, 517 U.S. at 582).

Lastly, under Gore, we consider the sanctions authorized or imposed in comparable cases. As Weaver acknowledges, the FHA allows courts to impose a civil penalty for certain violations prosecuted by the Attorney General. 42 U.S.C. § 3614(d). The civil penalty shall not exceed $55,000 for a first-time offense, and $110,000 for a subsequent violation. 28 C.F.R. § 85.3(b)(3) (2002). Although evidence was submitted from testers tending to show that Case discriminated on the basis of race on more than one occasion, he was only charged with, and found liable for, the incident pertaining to Weaver.

The Supreme Court has made it abundantly clear that our charge is to look closely at punitive damages awards, in light of the Gore guideposts. After considering each of the Gore guideposts, and weighing the relative strength or weakness of each, we are persuaded that the $100,000 punitive damages award must be remitted to $55,000 in order to comport with due process. We find in this case that the statutory maximum civil penalty offers the appropriate award on this record. See Campbell, 123 S. Ct. at 1519 (reiterating that the constitutional concern with grossly excessive or arbitrary punitive damages awards stems from "elementary notions of fairness enshrined in our constitutional jurisprudence [which] dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty"). Our holding in no way indicates our approval of Case's actions. We simply conclude that in this case a punitive damages award coextensive with the statutory maximum civil penalty is reasonable and proportionate to the wrong committed. United States v. Big D Enterprises, Inc., 184 F.3d 924, 934 (8th Cir. 1999)

16

(looking to the statutory maximum civil penalty allowed under the FHA for comparison). As the

Eighth Circuit stated in affirming a punitive damages award totaling $100,000 in a case under the

FHA, where the compensatory damages were $1,000:

> Appellants' acts of intentional racial discrimination demonstrate that this society's goal of providing housing free of racial bias has yet to be achieved. Punitive damage awards help ensure that citizens who engage in such contemptable behavior against other citizens receive society's full rebuke and condemnation. The punitive damage award in this case promotes such an outcome and reinforces the nation's commitment to protecting and preserving the civil rights of all.

Id.

## CONCLUSION

For the reasons stated above, we hold that the district court had subject matter jurisdiction

and that Weaver had standing to sue under the FHA. Because we conclude that remittitur of the

punitive damages award is necessary, we REVERSE the district court's denial of Case's motion for

remittitur and REMIT the punitive damages award to $55,000. In all other respects, the district

court's judgments are AFFIRMED.

AFFIRMED in part, REVERSED in part and REMITTED.