**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF ARIZONA; TERRY L.
GODDARD, Attorney General for the
State of Arizona; ARIZONA
DEPARTMENT OF LAW, Civil Rights
Division,

       *Plaintiffs-Appellees*,

ANGELA AGUILAR,
    *Intervenor-Plaintiff–Appellee*,

v.

ASARCO LLC,
    *Defendant-Appellant*.

No. 11-17484

D.C. No.
4:08-cv-00441-
MWB

OPINION

Appeal from the United States District Court
for the District of Arizona
Mark W. Bennett, District Judge, Presiding

Argued and Submitted
June 12, 2013—San Francisco, California

Filed October 24, 2013

Before: Diarmuid F. O'Scannlain and Andrew D. Hurwitz,
Circuit Judges, and James K. Singleton, Senior District
Judge.[*]

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Hurwitz

## SUMMARY[**]

### Employment Law / Punitive Damages

The panel vacated the district court's award of punitive damages in a Title VII sexual harassment suit where the jury awarded no compensatory damages and only one dollar in nominal damages.

The panel held that although the degree of reprehensibility of the defendant's conduct supported a substantial punitive damages award, and the district court's $300,000 award matched the Title VII damages cap, the award was constitutionally excessive in light of the fact that the ratio of punitive to compensatory damages was 300,000 to 1. The panel held that the highest punitive award supportable under due process was $125,000 because it was the highest award that maintained the required "reasonable relationship" between compensatory and punitive damages,

---

[*] The Honorable James K. Singleton, Senior District Judge for the U.S. District Court for the District of Alaska, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and nonetheless was on the order of the damages cap in Title VII and proportional to the reprehensibility of the defendant's conduct. The panel ordered that on remand, the district court could order a new trial unless the plaintiff accepted a remittitur to $125,000.

Concurring in part and dissenting in part, Judge Hurwitz agreed with the majority that the defendant's conduct was reprehensible and warranted punitive damages. He also agreed with the majority that a single-digit ratio between punitive and compensatory damages was not constitutionally mandated. Judge Hurwitz wrote that he nonetheless would affirm the district court's judgment in its entirety because the punitive damages award fell within the statutory cap on damages in Title VII.

---

## COUNSEL

David T. Barton, Quarles & Brady LLP, Phoenix, Arizona, argued the cause and filed a brief for the appellant. With him on the briefs were Eric B. Johnson and Brian A. Howie, Quarles & Brady LLP, Phoenix, Arizona.

Jenne S. Forbes, Waterfall, Economidis, Caldwell, Hanshaw & Villamana, P.C., Tucscon, AZ, argued the cause and filed a brief for appellees. With her on the briefs were Thomas C. Horne, Ann Hobart and Leslie Ross, Assistant Attorneys General, Phoenix, Arizona.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the Constitution permits a six-figure punitive damage award in a sexual harassment suit where the jury awarded no compensatory damages and only one dollar in nominal damages.

**I**

ASARCO is a large copper mining and refining company. One of its many facilities is the Mission Mine Complex, located in Sahuarita, Arizona, about thirty miles south of Tuscon. This facility includes both a mine and a mill, where copper ore is crushed, filtered and refined.

Angela Aguilar began working at the Mission mill facility on December 19, 2005. Including a leave of absence, Aguilar worked at the mill facility until November 8, 2006. During that time, Aguilar alleges that she was subjected to sexual harassment, retaliation, and constructive discharge.

**A**

The first alleged occurrence of sexual harassment began on March 19, 2006, when Aguilar became a car loader at the filter plant. Her supervisor in this role was Wayne Johnson. Johnson was a large man—6'2" and about 350 pounds—and according to Aguilar he made it known "at the start" that he was romantically interested in her. Aguilar testified that Johnson asked her out in some fashion "every day" and refused to train or to help her when she rejected him. Aguilar also claimed at trial that Johnson, when she asked for help,

would "stand[] right on top" of her and press up against her. She claimed that she was afraid that Johnson might rape her.[1]

According to Aguilar, her complaints about Johnson initially fell on deaf ears. She stated at trial that she complained to ASARCO's Human Resources Department ("HR") about Johnson's behavior several times and was told that there "is nothing [ASARCO] could do" and that Aguilar had to "handle it [herself]." The mill manager, Sam Lawrence, acknowledged that Aguilar complained to him about Johnson. Lawrence stated that he told Johnson to end his advances, and a week later, upon learning that Johnson had not stopped, threatened him with disciplinary action and the loss of his job. To "get away from" Johnson, Aguilar eventually bid for, and received, a promotion to another crew, where she started working on April 23, 2006.

B

While Aguilar was working at the filter plant, there was no functioning women's restroom in the building. ASARCO had rented a portable toilet, a "porta-potty," for Aguilar's use. According to Aguilar, immediately after the toilet was put up, it was vandalized with pornographic graffiti directed at her. Even after the toilet was replaced, the graffiti was apparently replicated on the replacement. Aguilar claimed that she reported the graffiti to the HR department, to mill supervisor

---

[1] ASARCO characterizes Aguilar's interactions with Wayne Johnson quite differently. It highlights that, when Aguilar met with HR about Johnson, contemporaneous notes of that meeting reveal that Aguilar told HR that Johnson "ha[dn't] touched her" and was "a complete gentlemen." It also points out that Aguilar wrote, in December 2006 notes, that Johnson's behavior was a "small problem."

Gary Schwartzberg, and to mill manager Sam Lawrence. There is no evidence that the situation was promptly remedied and photos show that visible pornographic graffiti remained on the toilet as late as 2007.**[2]**

C

On June 18, 2006, Aguilar became a rod and ball mill person, which took her from the filter plant to the main mill building.   In Aguilar's crew was   Julio Esquivel, a "distributed control systems operator."  Although he was not her direct supervisor, Aguilar reported to him and he maintained some authority over her day-to-day work.

Before Aguilar even had started in her new position, Esquivel warned, "your ass is mine" and told her that he would be spending more time with her than his "lady." According to Aguilar, Esquivel was often giving her conflicting orders, snapping his fingers at her, telling her to "watch herself," yelling at her, and threatening her with termination.  ASARCO responded to this testimony at trial by attempting to show that, as awful as Esquivel was toward Aguilar, it was not motivated by her sex but instead by his general boorishness.

As a result of Esquivel's reputation as a "rude bully" who "yelled at everybody," at least one manager at ASARCO did not feel the need to act in response to Aguilar's complaints. In July, Aguilar asked for a leave of absence to deal with personal problems relating to the custody of her children. She took that leave in September of 2006 and did not return

---

**[2]** The graffiti in the 2007 photographs is pornographic, but it is partially painted over and does not appear to be the graffiti described by Aguilar.

until November 1st. When she returned, she was placed on a different crew. Aguilar worked four more days and then quit ASARCO for good.

D

On March 21, 2008, Arizona filed suit in Pima County Superior Court against ASARCO on behalf of Aguilar and the state. Aguilar later filed her own suit, alleging sexual harassment under Title VII, retaliation and constructive discharge, relying on the same underlying facts. These proceedings were consolidated and removed to the United States District Court for the District of Arizona.

Aguilar's allegations were tried over eight days. The jury found ASARCO liable on the sexual harassment claims but not on the constructive discharge or retaliation claims. Critically, the jury did not find any compensatory damages for Aguilar, instead awarding her one dollar in nominal damages for the sexual harassment claim. The jury also awarded her $868,750 in punitive damages.

ASARCO moved for judgment as a matter of law or, in the alternative, for a new trial, arguing that the punitive damages awarded were statutorily and unconstitutionally excessive.[3] The district court ordered that the punitive damages be reduced to $300,000, which is the statutory maximum under Title VII for an employer of ASARCO's size. 42 U.S.C. § 1981a(b)(3)(D). However, the district court

---

[3] ASARCO also raised several other issues on appeal, which we address in a memorandum disposition filed concurrently with this opinion. In that memorandum disposition, we also address whether the district court erred in awarding attorneys fees to Aguilar.

held that these damages were not constitutionally excessive, and declined to reduce them any further.

ASARCO timely appealed.

## II

In 1996, the seminal Supreme Court case *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), changed the landscape of the law of punitive damages. *Gore* held that a punitive damages award which was grossly excessive could violate "[e]lementary notions of fairness enshrined in our constitutional jurisprudence." *Id.* at 574. In *Gore*, the Supreme Court laid out three "guideposts" for determining excessiveness: (1) "the degree of reprehensibility of the defendant's conduct"; (2) "[the] ratio to the actual harm inflicted on the plaintiff"; and (3) "civil or criminal penalties that could be imposed for comparable misconduct." *Id.* at 575–83. These guideposts need not be "rigidly or exclusively applied"; they merely provide a framework and must be viewed in the context of the case. *In re Exxon Valdez*, 472 F.3d 600, 613 (9th Cir. 2006). Our analysis in this case is further guided both by the only other Ninth Circuit case to address the *Gore* guideposts where the jury had only awarded nominal damages, *Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2008), and by cases which have considered the *Gore* guideposts in the context of discrimination suits.

We review the district court's application of these principles to the jury's award de novo. *Id.* at 1120. The district court's findings of fact, however, are reviewed for clear error. *Id.*

## A

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. In determining the reprehensibility of conduct, the Court has instructed lower courts to consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). On appeal, ASARCO attempts to run through each *State Farm* "subfactor" and to demonstrate that each one militates toward reduced reprehensibility. In evaluating these factors, we are cognizant that the goal is to place ASARCO's conduct "along a scale, with acts and threats of violence at the top . . . and finally, [with] acts of omission and mere negligence [at the bottom]." *Mendez*, 540 F.3d at 1120 (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001)) (internal quotation marks omitted). In making this determination, we are bound by the district court's findings of fact unless clearly erroneous. *See Mendez*, 540 F.3d at 1120.

On the first subfactor, ASARCO argues that the lack of damages indicates that its conduct caused no harm, much less

any *physical* harm. We reject this attempt to smuggle the inquiry for the second *Gore* guidepost into the first. *State Farm*'s direction to look at physical versus economic harm calls for us to examine the *type of conduct* at issue, not the magnitude of harm inflicted. In other words, *State Farm*'s first prong stands for the uncontroversial prospect that a defendant who has risked physical harm to a plaintiff has generally committed more reprehensible conduct than one who has risked only economic harm. When understood this way, ASARCO's conduct plainly falls into a more serious category than mere economic harm. This court has previously noted that "intentional discrimination" is a "serious affront to personal liberty" and should be considered high on the reprehensibility scale. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1043 (9th Cir. 2003) (citing *Romano v. U-Haul Int'l*, 233 F.3d 655, 673 (1st Cir. 2000) (finding that a plaintiff's termination on the basis of her sex was "more reprehensible than would appear in a case involving economic harms only")).

With regard to the second subfactor, ASARCO further relies on the jury's failure to award compensatory damages to argue that the district court clearly erred in finding "indifference or reckless disregard for Aguilar's health and safety." But indifference or recklessness with regard to a risk is entirely consistent with no damages, if that risk simply failed to materialize. There is ample evidence in this case to support the district court's finding, such as Johnson's daily advances, the targeted pornographic graffiti, and Esquivel's verbal abuse. The evidence further supports the district court's observation that ASARCO repeatedly failed to remedy these situations. Thus, we disagree that the lack of damages renders the district court's finding on this factor clearly erroneous.

ASARCO argues that the third *State Farm* subfactor—financial vulnerability—has no relevance unless ASARCO targeted Aguilar because of such vulnerability. This argument relies upon a misreading of *In re Exxon Valdez*, 472 F.3d at 617. That case addressed Exxon's reprehensibility with regard to the 1989 Exxon-Valdez oil spill. The court held that Exxon's reprehensibility was not increased by this factor simply because financially vulnerable subsistence fishermen were affected. *Id.* at 616–17. As the court stated, there must be "some element of intent to harm particular individuals or categories of individuals." *Id.* at 617. In this case *Exxon*'s requirement of "intent to harm" is met. Aguilar was the target of intentional sexual harassment; she was not a bystander affected by an outpouring of general negligence like the fishermen in *Exxon-Valdez*. Indeed, in order to award punitive damages under Title VII, the jury necessarily found that ASARCO acted "with malice . . . [or] with reckless indifference to the federally protected rights of [Aguilar]." ASARCO is right to a limited extent: Aguilar's financial vulnerability is not as significant as it would be if it had been directly exploited, as in a fraud case. But it is still relevant that Aguilar was an individual employee of limited means subject to the recklessness or malice of a large corporate bureaucracy. *See Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261 (11th Cir. 2008) (considering financial vulnerability prong in Title VII suit for racial discrimination and retaliation); *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 775 (9th Cir. 2005) (considering financial vulnerability prong in suit by Sikh-owned corporation for racial discrimination).

ASARCO challenges the district court's conclusion, on the fourth *State Farm* subfactor, that ASARCO's conduct "involved repeated actions," alleging that the "three incidents" involving different personnel are facially

insufficient to "label a defendant a recidivist." ASARCO clouds the waters by characterizing this inquiry as being about "recidivism"; *State Farm* makes clear that this sub-factor goes to establishing the uncontroversial prospect that "isolated incidents" are less reprehensible than "conduct involv[ing] repeated actions." *State Farm*, 538 U.S. at 419. There was nothing "isolated" about the conduct here, which involved repeated harassment by Wayne Johnson, pornographic graffiti which was not addressed, and cruel treatment by Esquivel over a lengthy period. Aguilar made repeated complaints which, as the district court found, went repeatedly unaddressed.

Finally, ASARCO even attempts to argue that its conduct did not involve "intentional malice, deceit, or trickery." This argument is in the face of the jury's finding, noted above, that ASARCO acted "with malice . . . [or] with reckless indifference to the federally protected rights of [Aguilar]" and the district court's finding that "ASARCO acted with a higher level of indifference, if not malice." ASARCO again relies on *Exxon-Valdez*, where the court concluded that Exxon's reckless conduct "did not result in intentional damage to anyone" and that this subfactor "militate[d] against viewing Exxon's misconduct as highly reprehensible." *In re Exxon-Valdez*, 472 F.3d at 618. But, as the district court's findings reveal, ASARCO's conduct toward Aguilar was targeted, worse than reckless, and served no possible productive purpose. *See Bains*, 405 F.3d at 775 ("An Exxon oil tanker that performs a socially valuable task can accidently run aground . . . . By contrast there can be no excuse for intentional, repeated [] harassment."). *Exxon-Valdez* does not help ASARCO. This factor also supports substantial damages.

Our analysis of each subfactor reveals that the district court did not err in concluding that ASARCO's conduct supports the imposition of a very large punitive award. Indeed, many other cases involving lengthy periods of harassment and discrimination have noted that similar conduct is highly reprehensible along these dimensions. *See, e.g.*, *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 839 (7th Cir. 2013) (weighing all five subfactors against employer who discriminated against disabled employee); *Bains*, 405 F.3d at 775; *Goldsmith*, 513 F.3d at 1283 (concluding employer conduct "was sufficiently reprehensible to support an award of punitive damages because the harm suffered by [plaintiff] was not purely economic, [plaintiff] was financially vulnerable, and the racially offensive comments and conduct were not isolated."); *Zhang*, 339 F.3d at 1044 ("We have no trouble concluding that the corporate defendants' discrimination against Zhang was sufficiently reprehensible."); *Swinton*, 270 F.3d at 818 ("In sum, we have no trouble concluding that the highly offensive language directed at Swinton, coupled by the abject failure of Potomac to combat the harassment, constitutes highly reprehensible conduct."). We conclude that substantial punitive damages are constitutionally acceptable in this case.

B

We next turn to the second *Gore* factor. And although we concluded that ASARCO's arguments regarding its reprehensibility are without merit, its arguments about this *Gore* factor stand on stronger ground. The Supreme Court has noted that "[punitive] damages must bear a reasonable relationship to compensatory damages." *Gore*, 517 U.S. at 580 (internal citations and quotation marks omitted). Further, the Court has stated that "few awards exceeding a single-digit

ratio between punitive and compensatory damages . . . will satisfy due process." *State Farm*, 538 U.S. at 425. Nonetheless, the Court has steadfastly refused to create a bright-line ratio and has emphasized that a higher ratio is justified when "a particularly egregious act has resulted in only a small amount of economic damages." *Id.*

The district court in this case approved a punitive award with a ratio of 300,000 to 1.[4] If allowed, it would surely be among the highest (if not the highest) ratio approved since *Gore* changed the landscape and the highest ratio we could locate in a survey of discrimination cases.[5] The highest ratio

---

[4] We evaluate the ratio with regard to $300,000, rather than with regard to the $868,750 that the jury awarded. Other courts have done the same. *See, e.g.*, *AutoZone, Inc.*, 707 F.3d at 839–40 (utilizing reduced $200,000 figure for ratio rather than $500,000 awarded by jury); *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 933 (8th Cir. 2004) (utilizing reduced $300,000 figure for ratio rather than $829,197 awarded by jury); *Romano*, 233 F.3d at 673 (utilizing reduced $285,000 figure for ratio rather than $650,000 awarded by jury).

[5] *See AutoZone, Inc.*, 707 F.3d at 839–40 (upholding a $200,000 punitive damages award and a $100,000 compensatory damages award); *Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 804 (8th Cir. 2013) (upholding a $500,000 punitive damages award and a $100,000 compensatory damages award); *Equal Employment Opportunity Comm'n v. Fed. Express Corp.*, 513 F.3d 360, 377–78 (4th Cir. 2008) (upholding a $100,000 punitive damages award and an $8,000 compensatory damages award); *Goldsmith*, 513 F.3d at 1283 (upholding a $500,000 punitive damages award and a $54,321 compensatory damages award); *Tisdale v. Fed. Express Corp.*, 415 F.3d 516 (6th Cir. 2005) (upholding a $100,000 punitive damages award and a $15,000 compensatory damages award); *MacGregor*, 373 F.3d at 933 (upholding a $300,000 punitive damages award and a $170,803 compensatory damages award); *Zhang*, 339 F.3d at 1044 (upholding a $2,600,000 punitive damages award and a $360,000 compensatory damages award); *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003) (upholding a $13,300,000 punitive damages award and

among these cases is the 125,000 to one ratio approved by the Fifth Circuit in *Abner v. Kansas City Southern Railroad Co.*[6] That is less than half of the ratio at issue here.

It seems clear, based on the analysis of the *State Farm* subfactors, that this is a "particularly egregious act." *State Farm*, 538 U.S. at 425. But even "particularly egregious acts" are subject to the requirement of reasonableness. The Supreme Court has repeatedly emphasized the importance of the ratio inquiry and we cannot cast it aside. *Gore*, 517 U.S. at 583 (calling a 500 to 1 ratio "breathtaking" and stating that it rightly "raise[d] a suspicious judicial eyebrow"); *State*

a $3,500,000 compensatory damages award); *Swinton*, 270 F.3d at 819 (upholding a $1,000,000 punitive damages award and a $35,600 compensatory damages award); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 82 (1st Cir. 2001) (upholding a $400,000 punitive damages award and a $200,000 compensatory damages award); *Hampton v. Dillard Dep't Stores*, 247 F.3d 1091, 1117 (10th Cir. 2001) (upholding a $1,100,000 punitive damages award and a $56,000 compensatory damages award); *Romano*, 233 F.3d at 673 (upholding a $285,000 punitive damages award and a $15,000 compensatory damages award); *Equal Employment Opportunity Comm'n v. W&O, Inc.*, 213 F.3d 600, 617 (11th Cir. 2000) (upholding a $300,000 punitive damages award and a $36,257.13 compensatory damages award); *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1273 (10th Cir. 2000) (upholding a $295,000 punitive damages award and a $5,000 compensatory damages award); *Shea v. Galaxie Lumber & Constr. Co.*, 152 F.3d 729, 736 (7th Cir. 1998) (upholding a $2,500 punitive damages award and a $1 compensatory damages award).

[6] The Fifth Circuit has specifically rejected the applicability of the "ratio" prong of *Gore* in any case involving nominal damages. *See Williams v. Kaufman Cnty.*, 352 F.3d 994, 1016 (5th Cir. 2003) ("[A]ny punitive damages-to-compensatory damages 'ratio analysis' cannot be applied effectively in cases where only nominal damages have been awarded."). This is not the rule in the Ninth Circuit, see *Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2008).

*Farm*, 538 U.S. at 426 ("courts must ensure that the measure of punishment is both reasonable and proportionate . . ."). But knowing that the ratio guidepost must inform our analysis does not tell us what ratio would be appropriate in a given case.

So although we conclude that the requirement of a reasonable relationship between compensatory and punitive damages suggests that these damages should be reduced, a third *Gore* factor must be considered before we can make a final determination.

C

The third *Gore* factor asks us to compare the punitive damages award to "civil or criminal penalties that could be imposed for comparable misconduct." *Gore*, 517 U.S. at 583. The district court below relied on *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003), and *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001), and held that it was appropriate to treat Title VII's damages cap as "a legislative judgment similar to the imposition of a civil fine." *Zhang*, 339 F.3d at 1044. Although both *Zhang* and *Swinton* were § 1981 cases rather than Title VII cases, the district court saw them as standing for the idea that punitive awards below the statutory cap are generally constitutionally reasonable.[7]

---

[7] Along similar lines, the Fifth Circuit upheld a $125,000 punitive award in a case involving race-based hostile work environment claims where the plaintiffs were only awarded $1 in nominal damages, primarily on the basis of the existence of Title VII's statutory cap. *Abner v. Kansas City S. R.R. Co.*, 513 F.3d 154, 164 (5th Cir. 2008). According to the court in that case, "the combination of the statutory cap and [the] high threshold of culpability" confined *any* award to a level tolerated by due process. *Id.*

ASARCO argues that the statutory cap is not a relevant "civil penalty" by which to benchmark the punitive award in this case and that "constitutional questions [cannot] turn on congressional judgments." *Williams v. ConAgra*, 378 F.3d 790, 798 (8th Cir. 2004). These arguments miss the mark. First, this is clearly a relevant "civil penalty": the existence of a statutory cap gives defendants "fair notice . . . of the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 574. Second, *Gore*'s guidepost specifically directs courts to look at comparable civil and criminal penalties. This rule necessarily ensures that constitutional questions turn in part on congressional judgments.

*Williams*, which struck down a $6,063,750 punitive damages award as unconstitutionally excessive, is not to the contrary. With respect to the third *Gore* guidepost, *Williams* only suggested that the Title VII cap might not represent an appropriate benchmark with respect to an award in a § 1981 case. However, this is a genuine Title VII case. The $300,000 damages cap surely represents an example of a "legislative judgment[] concerning appropriate sanctions for the conduct at issue." *Gore*, 517 U.S. at 583 (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301 (1989) (O'Connor, J., concurring in part and dissenting in part)). We agree with the district court that this factor weighs in favor of damages at least on the order of the statutory cap.

---

According to the court, the only way a Title VII award could offend due process would be if the statutory cap itself offended due process. *Id.* Although certainly the statutory cap and the high threshold of culpability impact our *Gore* analysis, no authority supports the Fifth Circuit's conclusion that *Gore* is rendered extraneous by the existence of these factors in Title VII.

D

Given ASARCO's highly reprehensible conduct and the presence of a comparable civil penalty in the form of the Title VII damages cap, we conclude that the Constitution does not bar the imposition of a substantial punitive award in this case. But this does not change the fact that a 300,000 to 1 ratio raises our "judicial eyebrow[s]." *Gore*, 517 U.S. at 583.

In *Mendez v. County of San Bernardino*, the only other Ninth Circuit case to address the *Gore* guideposts where only nominal damages were awarded, the court held a $250,000 award excessive. *Mendez*, 540 F.3d at 1122–23. The defendant in that case, an officer, was found to have recklessly disregarded the constitutional rights of a Spanish-speaking woman when he took advantage of her poor grasp of English and railroaded her into consenting to a search of her home. *Id.* at 1116. Mendez was awarded only $1 on each of her false arrest and illegal search claims but $250,000 in punitive damages against the officer. The court relied heavily upon the second *Gore* guidepost in striking down the award, noting that the $250,000 figure was "staggering" in light of the lack of actual damages. *Id.* at 1122.

Importantly, the court in *Mendez* approved the district court's remittitur of Mendez's award to $5,000—a 2,500 to one ratio, because *Mendez* involved well in excess of the traditional ten to one that the Supreme Court has approved. *Id.* This provides us with at least some guidance as to how to reduce this award, and ASARCO argues that we should follow *Mendez*'s ratio and remit punitive damages in this case to $2,500.

We disagree.  The court in *Mendez* noted substantially less reprehensibility than there was in this case: the court concluded that the officer's conduct was closer to mere accident than to malice, the conduct was an isolated incident, and the conduct posed no risk to Mendez's health or safety. *Id.* at 1121.  Here, all of those factors are reversed, so it stands to reason that ASARCO's conduct supports a higher ratio of damages.  Furthermore, the third *Gore* guidepost was of no help in *Mendez*, while here it weighs in favor of a larger award.  Finally, *Mendez* noted the importance of an award "sufficient to deter [defendants] from engaging in similar conduct in the future." *Id.* at 1122.  A $2,500 award would clearly be insufficient to deter ASARCO in this case, even considering the award of $350,903 in attorneys' fees.

Although we think a ratio higher than 2,500 to one is called for by ASARCO's conduct, the $300,000 awarded was nonetheless excessive.  As we indicated above, no court in a discrimination case has ever upheld a ratio of punitive damages to compensatory damages greater than 125,000 to 1. Many discrimination cases have struck down awards as constitutionally excessive with substantially smaller ratios. *See Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 149–50 (2d Cir. 2011) (holding that a $1.6 million punitive damages award, in comparison to a $280,000 compensatory damages award, violates due process); *Mendez-Matos v. Mun. of Guaynabo*, 557 F.3d 36, 55 (1st Cir. 2009) (holding that a $350,000 punitive damages award, in comparison to a $35,000 compensatory damages award, violates due process); *Bains*, 405 F.3d at 776–77 (holding that a $5 million punitive damages award, in comparison to a $50,000 compensatory damages award, violates due process); *Williams*, 378 F.3d at 798 (holding that a $6,063,750 punitive damages award, in comparison to a $600,000 compensatory damages award,

violates due process); *Lincoln v. Case*, 340 F.3d 283, 294 (5th Cir. 2003) (holding that a $100,000 punitive damages award, in comparison to a $500 compensatory damages award, violates due process); *Ross v. Kan. City Power & Light Co.*, 293 F.3d 1041, 1049 (8th Cir. 2002) (holding that a $120,000 punitive damages award, in comparison to a $6,000 compensatory damages award, violates due process); *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 408 (5th Cir. 2000) (holding that a $750,000 punitive damages award, in comparison to a $2,500 compensatory damages award, violates due process).

Our task in reducing the award is not easy. No bright line ratio has been set by the Supreme Court for cases which are "particularly egregious." *State Farm*, 538 U.S. at 425. Since nothing compels a particular dollar figure, we conclude that the highest punitive award supportable under due process is $125,000, in accord with the highest ratio we could locate among discrimination cases. *Abner*, 513 F.3d at 164. We think this is the highest award which maintains the required "reasonable relationship" between compensatory and punitive damages. *Gore*, 517 U.S. at 580. This award is nonetheless on the order of the damages cap in Title VII and proportional to the reprehensibility of ASARCO's conduct.

## III

We conclude that the punitive damages award of $300,000 is outside of constitutional limits, so it must be

vacated. On remand, the district court may order a new trial unless the plaintiff accepts a remittitur to $125,000.

Each party shall bear its own costs on appeal.

**VACATED AND REMANDED** for proceedings consistent with this opinion.

---

HURWITZ, Circuit Judge, concurring in part and dissenting in part:

Judge O'Scannlain's majority opinion ably navigates the doctrinal shoals created by the Supreme Court's constitutionalization of punitive damages. I agree with the majority that ASARCO's conduct was reprehensible and warranted punitive damages. I also agree with the majority that a single-digit ratio between punitive and compensatory damages is not constitutionally mandated in cases involving nominal damages. I differ from my shipmates only as to the final port of call. Rather than reduce the punitive damages award to $125,000, I would affirm the judgment below in its entirety because the award falls within the statutory cap on damages in Title VII.

In *BMW of North America, Inc. v. Gore*, the Supreme Court held that a punitive damages award violates due process if it is "grossly excessive" in relation to the government's interests in punishing unlawful conduct and deterring its repetition. 517 U.S. 559, 568 (1996). The Court explained that the Due Process Clause of the Fourteenth Amendment limits punitive damages awards because "[e]lementary notions of fairness . . . dictate that a person

receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.* at 574.

A properly instructed jury awarded one dollar in nominal damages and $868,750 in punitive damages against ASARCO for its reprehensible conduct. The trial judge then reduced the total award—as required by Title VII—to $300,000, 42 U.S.C. § 1981a(b)(3)(D), but declined to reduce the award further. The issue is thus whether the $299,999 punitive damages award "can fairly be categorized as 'grossly excessive' in relation to the" government's interests in punishment and deterrence such that "it enter[s] the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Gore*, 517 U.S. at 568 (internal quotations omitted). I cannot so conclude.

The majority, although properly rejecting a single-digit ratio test in a case with nominal damages, nonetheless concludes that it must apply *some* sort of ratio analysis to comply with *Gore*. It then finds guidance in a Fifth Circuit opinion which upheld an award of one dollar in nominal damages and $125,000 in punitive damages to plaintiffs who suffered racial discrimination in the workplace. *Abner v. Kan. City S. R.R. Co.*, 513 F.3d 154, 157 (5th Cir. 2008).

*Abner* does provide important guidance, but quite different than that discerned by the majority. The Fifth Circuit concluded in that case that ratio analysis should not apply because, in Title VII cases, Congress has cabined "discretion in the amount of the award in the most direct manner possible": It placed a cap on the permissible aggregate of compensatory and punitive damages. *Id.* at 163. As that court recognized, the issue in a Title VII case is

therefore not the ratio between punitive and compensatory damages, but instead "if the statutory cap itself offends due process." *Id.* at 164.

Two of our sister circuits have held that the $300,000 statutory cap in Title VII obviates any due process concerns when the plaintiff has proven egregious conduct. *Id.* ("[T]he combination of the statutory cap and high threshold of culpability for any award confines the amount of the award to a level tolerated by due process."); *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir. 2001) ("We hold that in Title VII cases . . . punitive damages may be awarded within the limits of the statutory caps if the defendant has been shown to have acted with a state of mind that makes punitive damages appropriate . . . ."). I agree.

*Mendez v. County of San Bernardino*, 540 F.3d 1109 (9th Cir. 2008), upon which the majority relies, is not to the contrary. In *Mendez*, the district court found a $250,000 punitive damages award grossly excessive when only one dollar in nominal damages was awarded on the plaintiff's § 1983 false arrest and illegal search claims. *Id.* at 1122. This court approved the district court's remittitur of Mendez's award to $5,000. Like *Abner*, *Mendez* stands for the proposition that single-digit ratio analysis is not a talisman in civil rights cases involving nominal damages. But, unlike this case and *Abner*, the statute at issue in *Mendez*, 42 U.S.C. § 1983, has no cap on punitive damages. *Mendez* therefore does not instruct us that ratio analysis is required in Title VII cases.

*Gore* explained that "a reviewing court engaged in determining whether an award of punitive damages is excessive should accord substantial deference to legislative

judgments concerning appropriate sanctions for the conduct at issue." 517 U.S. at 583 (internal quotations omitted). Thus, a relevant civil penalty provides the notice necessary to allow a punitive damages award. *Id.* at 574. The majority correctly concludes that the Title VII damages cap is "clearly a relevant 'civil penalty.'" Majority Op. at 17 (internal quotations omitted); *see Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1045 (9th Cir. 2003) (holding that Title VII's damages cap is "a legislative judgment similar to the imposition of a civil fine"). This case is therefore analytically no different than if Title VII gave the trial court the power to impose a fine not to exceed $300,000 upon finding egregious conduct. A defendant receiving a fine within the statutory limits could hardly complain of a due process violation because of the absence of notice.

And, although I agree with the analysis in *Abner*, I find it problematic that the majority believes that the ceiling of constitutionally acceptable punitive damages in Title VII cases has somehow forever been fixed by that opinion. Would a different result be mandated if the Fifth Circuit in *Abner* had upheld a jury award of the full $300,000 allowed by Title VII? *Abner* simply affirmed a jury award of $125,000 in exemplary damages. It did not hold that this award was the maximum permissible under the Constitution, let alone that it was forever fixing the constitutional ratio for punitive damage awards.

Of course, even absent due process concerns, a district court should reduce a punitive damages award if unsupported by the evidence. But the district judge declined to do that here, and the majority does not suggest he erred on that score. I would therefore leave the trial court's considered judgment undisturbed, and affirm the judgment below.